# JOHNSON *v.* UNITED STATES.

---

CRIMINAL LAW; ARRAIGNMENT; APPEAL AND ERROR; HOMICIDE; VERDICT, QUALIFICATION OF; STATUTES; REPEAL.

1. The object of an arraignment is the identification of the accused and the framing of an issue upon which he may be tried.

2. The recital in the record on an appeal in a homicide case, that "the defendant, being arraigned, pleads thereto," coming to this court, approved by the trial court, must be taken to mean that all steps essential to a proper arraignment were taken, including the reading of the indictment to the accused; and the verity of the record cannot be impeached by an affidavit appearing in the record, of counsel for the accused, made in support of a motion for a new trial and in arrest of judgment, to the effect that the accused waived the reading of the indictment.

3. *Quære*, whether the accused in a capital case may waive the reading of the indictment.

4. A jury in the District of Columbia may not qualify a verdict of murder in the first degree by adding thereto "without capital punishment." (Citing secs. 5339 and 5345, Rev. Stat. U. S. Comp. Stat. 1901, p. 3627 and 3630, as amended by the act of Congress of January 15, 1897, 29 Stat. at L. 487, chap. 29, U. S. Comp. Stat. 1901, p. 3620; acts of Congress of June 4, 1897, 30 Stat. at L. 58, chap. 2; March 3, 1901, 31 Stat. at L. 1181, chap. 853; March 3, 1901, 31 Stat. at L. 1189, chap. 854; June 30, 1906, 34 Stat. at L. 754, chap. 3914, U. S. Comp. Stat. Supp. 1909, p. 236; March 4, 1909, 35 Stat. at L. 1088, chap. 321, U. S. Comp. Stat. Supp. 1909, p. 1391; and secs. 1, 798, 801, 808, 1639, 1640, D. C. Code [31 Stat. at L. 1189, 1321, 1322, 1436, chap. 854]; and *Strather* v. *United States*, 13 App. D. C. 132; *United States ex rel. Daly* v. *Macfarland*, 28 App. D. C. 552, and *Sullivan* v. *Goldman*, ante, 319.)

5. The act of Congress of March 4, 1909 (35 Stat. at L. 1088, chap. 321, U. S. Comp. Stat. Supp. 1909, p. 1391), known as the Federal Penal Code, embraces general legislation of general operation; while the Code of the District of Columbia embraces local legislation of local operation; and an intent to repeal the latter by the former will not be implied. (Citing *Sullivan* v. *Goldman*, ante, 319.)

No 2349. Submitted February 5, 1912. Decided March 4, 1912.

HEARING on an appeal by the accused from a judgment of conviction of the Supreme Court of the District of Columbia sitting as a criminal court, in a homicide case.      *Affirmed.*

The facts are stated in the opinion.

*Mr. Joseph Salomon* and *Mr. Thomas M. Baker* for the appellant.

*Mr. Clarence R. Wilson,* United States District Attorney, and *Mr. James M. Proctor,* Assistant, for the appellee.

*Mr. D. W. Baker* appeared *amicus curiæ.*

Mr. Justice ROBB delivered the opinion of the Court:

Appeal by a defendant convicted in the supreme court of the District of murder in the first degree, and sentenced to death. The evidence for the United States tended to show, to quote from the record, "that the defendant killed John Ofenstein, in the District of Columbia, on the day on which the indictment charged that offense against him, by striking Ofenstein on the head with a heavy iron rod, and there was evidence tending to show that the act was done purposely, and with premeditation and deliberation." The evidence for the defendant tended to show that at the time of the commission of the acts charged in the indictment, he "had been drinking intoxicating liquors." Two questions only are presented for review.

1. It is contended that there should have been an arrest of judgment because, as the defendant insists, the indictment was

not read to him.   Upon this branch of the case the recital in the record is as follows: "Come as well the attorney of the United States as the defendant, in proper person, in custody of the warden of the United States jail in and for the District of Columbia, and by his attorney T. M. Baker, Esquire; and *thereupon the defendant, being arraigned upon the indictment, pleads thereto* not guilty, and for trial puts himself upon the country, and the attorney of the United States doth the like." In support of the motion for a new trial and in arrest of judgment, counsel for the defendant made and filed an affidavit, which is in the record, in which it is stated that when the defendant was called for arraignment, he was asked if his name was Arthur Johnson, and, upon his affirmative answer, "was then asked by the clerk if he waived the reading of the indictment, and he replied that he did."   The affidavit further states that the defendant was then asked by the clerk if he wished to plead guilty or not guilty, and that he replied not guilty.

The term "arraignment" has a well-defined signification. Strictly speaking, the defendant is arraigned by being called to the bar of the court to answer the accusation contained in the indictment, the arraignment consisting of three parts: (1) Calling the defendant by name and commanding him to hold up his hand, that his identification may be certain; (2) reading to him the indictment, and (3) taking his plea.   4 Bl. Com. 322; 4 Hargrave, St. Tr. 777; 2 Hale, P. C. 219; 1 Chitty, Crim. Law, 414; *Crain* v. *United States,* 162 U. S. 625, 637, 40 L. ed. 1097, 1100, 16 Sup. Ct. Rep. 952.   The object of an arraignment is the identification of the accused and the framing of an issue upon which he may be tried.   According to the Criminal Code of Indiana "the defendant is arraigned by reading to him the indictment and requiring him to plead thereto."   In *Clare* v. *State,* 68 Ind. 17, it was held that the recital in the record that the defendant, "being arraigned and required to plead," etc., necessarily implied the reading of the indictment.   A similar ruling was made in *State* v. *Weeden,* 133 Mo. 70, 34 S. W. 473.   See also *Powers* v. *United States,* recently decided in the Supreme Court of the United States [223 U. S. 303, 56 L. ed. —, 32 Sup. Ct. Rep. 281].

The recital in the record in the case at bar that "the defendant being *arraigned upon the indictment,* pleads thereto," coming to us with the sanction and approval of the trial court, must necessarily be understood to mean that all the steps essential to a proper arraignment were taken.  And the verity of the record may not be impeached in the manner attempted. To permit it to be thus contradicted would overturn well-established rules of procedure, and lead to much confusion.  "The record imports absolute verity; an affidavit of a witness does not; and when the court, which in addition may be supposed to have personal knowledge of the fact, sustains the recital in the record as against the statement in the affidavit, its ruling cannot on review be adjudged erroneous." *Evans* v. *Stettnisch,* 149 U. S. 605, 37 L. ed. 866, 13 Sup. Ct. Rep. 931; *Hudgins* v. *Kemp,* 18 How. 530, 15 L. ed. 511.

It is therefore unnecessary, in the present case, to determine whether the defendant in a capital case may waive the reading of the indictment.  In the *Crain Case,* 162 U. S. 625, 40 L. ed. 1097, 16 Sup. Ct. Rep. 952, the conviction was set aside because it did not affirmatively appear that the defendant ever pleaded to the indictment, the ground of the ruling being that until such a plea was entered, there was no issue to be tried. The question attempted to be raised in the case at bar was not passed upon.

2. The more serious question is presented whether a jury in the District of Columbia may qualify a verdict of murder in the first degree by adding thereto "without capital punishment."  The court was requested to instruct the jury that it might so qualify its verdict.  The ruling was against the defendant, and an exception was noted.

Under sec. 5339 of the Revised Statutes of the United States, U. S. Comp. Stat. 1901, p. 3627, every person who committed murder was punishable by death.  Under sec. 5345 of the same statutes, *the same punishment was prescribed for the crime of rape.*  These statutes continued in full force until, on January 15, 1897, Congress provided that a verdict of guilty of murder *or of rape* under the two-named sections

might be qualified by the addition of the words "without capital punishment," in which event the convicted person should be sentenced to imprisonment at hard labor for life (29 Stat. at L. 487, chap. 29, U. S. Comp. Stat. 1901, p. 3620). It will be observed that more than one degree of murder had not been established at that time. Said secs. 5339 and 5345, having been applicable "within any fort, arsenal, dockyard, magazine, or in any other place or district of country under the exclusive jurisdiction of the United States," were necessarily in force in this jurisdiction, as was said act of January 15, 1897. *Strather* v. *United States,* 13 App. D. C. 132; *Winston* v. *United States,* 172 U. S. 303, 43 L. ed. 456, 19 Sup. Ct. Rep. 212.

Under the act of June 4, 1897 (30 Stat. at L. 58, chap. 2), provision was made for the appointment of a commission to revise and codify the criminal and penal laws of the United States. The duties of this commission were further enlarged by the act of July 1, 1898 (30 Stat. at L. 643, chap. 546), and the act of March 3, 1901 (31 Stat. at L. 1181, chap. 853). Under the last-named act it was made the duty of the commission to include in its revision and codification "all laws of the United States of a permanent *and general nature* in force at the time the same shall be reported."

On March 3, 1901, which it will be noted was the very day upon which the codification commission was authorized to include in its revision all laws of the United States of a permanent *and general nature,* "An Act to Establish a Code of Law for the District of Columbia," was approved (31 Stat. at L. 1189, chap. 854). According to House Report No. 1017, Fifty-sixth Congress, first session, that Code was the culmination of sixty years of effort by the people of this District to have Congress adopt a Code of the general and permanent statutes affecting local personal and property rights. It was intended to be, and is in fact, a very comprehensive body of local law, containing sixty chapters, embracing 1,642 sections. Various amendments have from time to time been adopted by Congress. Under sec. 1 of the Code it

was provided that "all general acts of Congress not locally in-applicable in the District of Columbia, and all acts of Con-gress by their terms applicable to the District of Columbia and to other places under the jurisdiction of the United States, in force at the date of the passage of this act, shall remain in force *except in so far as the same are inconsistent with, or are replaced by, some provision of this Code.*" Sec. 1640 pro-vided that nothing in the repealing clause should be held to affect the operation or enforcement in this District "of any general statute of the United States not locally inapplicable in the District of Columbia, or by its terms applicable to the District of Columbia and to other places under the jurisdiction of the United States, * * * except in so far as the same may be inconsistent with, or is replaced by, some provision of this Code."

Sec. 798, subchapter 1 of chapter 19, dealing with "Crimes and Punishments," defines murder in the first degree as fol-lows: "Whoever, being of sound memory and discretion, pur-posely, and either of deliberate and premeditated malice or by means of poison, or in perpetrating, or in attempting to perpe-trate, any offense punishable by imprisonment in the peniten-tiary, kills another, is guilty of murder in the first degree." The first part of this definition is substantially that given by Coke (3 Inst. 47), and adopted by Blackstone (4 Com. 195) and Chitty (2 Crim. Law, 724). Sec. 799 makes the placing of an obstruction on a railroad, under certain conditions and where death ensues, murder in the first degree. Sec. 800 pre-scribes that "whoever, with malice aforethought, except as provided in the last two sections, kills another, is guilty of murder in the second degree." Thus it came to pass that Con-gress for the first time established two degrees of murder in this jurisdiction. Sec. 801 ordains that the punishment for murder in the first degree shall be death by hanging; for murder in the second degree, imprisonment for life or not less than twenty years. Sec. 808 prescribes the punishment for rape as *not less than five nor more than thirty years.* The sec-tion further provides, however, "that in any case of rape the

jury may add to their verdict, if it be guilty, the words 'with the death penalty,' in which case the punishment shall be death by hanging."

We think it plain that by the enactment of the District Code, Congress intended to replace and supersede all general statutes of the United States dealing with the same subject-matter. To be still more specific, we think that when Congress established two degrees of murder, defined the punishment for each, and prescribed the punishment for rape, it intended that those provisions should replace and supersede the general statutes of the United States dealing with those offenses. Substantially the same result was achieved by the establishment of two degrees of murder as was effected by said act of January 15, 1897, permitting a jury to qualify its verdict; in other words, where, upon consideration of all the facts and circumstances developed by the evidence, the jury would not be convinced that murder in the first degree, as defined by the statute and explained by the court, had been shown, they might return a verdict of murder in the second degree. *Hopt* v. *Utah,* 104 U. S. 631, 26 L. ed. 873, 4 Am. Crim. Rep. 365; 110 U. S. 582, 28 L. ed. 266, 4 Sup. Ct. Rep. 202, 4 Am. Crim. Rep. 417. In the *Winston Case,* 172 U. S. 303–310, 43 L. ed. 456–459, 19 Sup. Ct. Rep. 212, the court said: "The hardship of punishing with death every crime coming within the definition of murder at common law, and the reluctance of jurors to concur in a capital conviction, have induced American legislatures in modern times to allow some cases of murder to be punished by imprisonment instead of by death." The court further observed that this result has usually been attained in one of two ways: First, by statutes establishing degrees of murder and providing for the death penalty in those cases only in which the verdict is murder in the first degree; and second, statutes "conferring upon the jury, in every case of murder, the right to decide whether it shall be punished by death or by imprisonment."

A further reason for holding that the provisions of the Code relating to murder and rape were intended to supersede the

provisions of the general statutes relating to those crimes is found in the fact that under the general statutes. rape was primarily punishable by death, the jury, as we have seen, having the right to qualify its verdict, in event of which the punishment was imprisonment for life.   Under the Code the punishment for rape primarily was not less than five nor more than thirty years imprisonment, the jury having the right to add to its verdict the words "with the death penalty."

A careful study of the District Code irresistibly leads to the conclusion that Congress in its enactment stepped aside from its revision and codification of the general laws of the United States, and, in its capacity as a national legislature for this municipality (*United States ex rel. Daly* v. *Macfarland*, 28 App. D. C. 552–558), revised and brought together statutes supposedly applicable to conditions here existing.   The main object in thus bringing together those local statutes was to do—away with ambiguity and provide for the people of the capital city a compact Code of law.   Congress, of course, realized that conditions obtaining in this comparatively large city might in many respects differ from conditions obtaining in other parts of the country under the exclusive jurisdiction of the United States.   It also apparently fully appreciated the wisdom and necessity of providing such a considerable number of people—approximately as many as are found in some of the States—with a concise body of law for their government, rather than to leave them to the masses of the general statutes of the United States.

By the act of June 30, 1906 (34 Stat. at L. 754, chap. 3914, U. S. Comp. Stat. Supp. 1909, p. 236), the commission for the revision and codification of the laws of the United States was directed to make its final report to Congress in the December ensuing.   This report resulted, on March 2, 1907, in the appointment of a joint special committee of the Senate and House, to submit to Congress recommendations upon such revision and codification.   This committee first considered and reported an "Act to Codify, Revise, and Amend the Penal Laws of the United States," which, after Amendment, was

adopted on March 4, 1909 (35 Stat. at L. 1088, chap. 321, U. S. Comp. Stat. Supp. 1909, p. 1391). Chapter 1 comprises offenses against the existence of the government; chapter 2, offenses against neutrality; chapter 3, offenses against the elective franchise and civil rights of citizens; chapter 4, offenses against the operation of government; chapter 5, offenses relating to official duties of Federal officers, clerks, agents, employees, etc.; chapter 6, offenses against public justice; chapter 7, offenses against the currency, coinage, etc.; chapter 8, offenses against the postal service; chapter 9, offenses against foreign and interstate commerce; chapter 10, the slave trade and peonage. It is plain that these ten chapters deal with general statutes of the United States, and not with statutes of a local character.

Chapter 11 of this Criminal Code of the United States deals with offenses within the admiralty, maritime and territorial jurisdiction of the United States, sec. 272 of this chapter providing that the crimes and offenses defined in the chapter shall be punishable as therein prescribed: First, when committed upon the high seas, etc.; second, when committed upon any vessel registered, licensed, or enrolled under the laws of the United States, etc.; third, "when committed within or on any lands reserved or acquired for the exclusive use of the United States, and under the exclusive jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building." Sec. 273 defines murder as the unlawful killing of a human being with malice aforethought. The section also defines murder in the first degree, and ordains that any other murder is murder in the second degree. Sec. 275 prescribes the death penalty for murder in the first degree, and for murder in the second degree imprisonment for not less than ten years or for life. Sec. 278 prescribes the death penalty for rape.

Chapter 12 deals with piracy and other offenses upon the seas. Chapter 13 treats of "Certain Offenses in the Terri-

tories" sec. 311 of this chapter prescribing that "except as otherwise expressly provided, the offenses defined in this chapter shall be punished as hereinafter provided, when committed within any Territory or district, *or within or upon any place within the exclusive jurisdiction of the United States.*" Sec. 312 of this chapter relates to the circulation of obscene literature and the promotion of abortions; sec. 313 to polygamy; sec. 314 to unlawful cohabitation; sec. 316 to adultery; sec. 317 to incest; and sec. 318 to fornication. Sec. 319, penalizes the failure to regard certificates of marriage, and is in terms made applicable only to "the Territorities of the United States." Secs. 320 and 321, relating to prize fights and bull fights, are in terms restricted in their application to the Territories of the United States and the District of Columbia. Sec. 322, which is the last section, of the chapter, relates to train robberies. Chapter 14 embraces "General and Special Provisions." Sec. 339 of that chapter, however, expressly ordains that "the arrangement and classification of the several sections of this title have been made for the purpose of a more convenient and orderly arrangement of the same, and therefore no inference or presumption of a legislative construction is to be drawn by reason of the chapters under which any particular section is placed." Sec. 323 of this chapter prescribes that the manner of inflicting the punishment of death shall be by hanging. Sec. 330, which is a mere re-enactment of sec. 1 of said act of January 15, 1897, provides that "in all cases where the accused is found guilty of the crime of murder in the first degree, or rape, the jury may qualify their verdict by adding thereto 'without capital punishment;' and whenever the jury shall return a verdict qualified as aforesaid, the person convicted shall be sentenced to imprisonment for life." Sec. 331 permits the court, in its discretion, to add to the judgment of death that the body of the offender be delivered to a surgeon for dissection, whereupon "*the marshal who executes such judgment* shall deliver the body," etc.

It is contended that chapter 11 of the Federal Criminal Code, as well as chapter 14, are in force in the District of

Columbia, and hence that the provisions in these chapters relating to the crime of murder have, by implication, repealed and superseded corresponding provisions in the local Code. There are many reasons for believing that this contention is not sustainable. We will first look to the letter of the statute. The Revised Statutes relating to murder, as we have seen, embraced forts, arsenals, dockyards, magazines, and other places or districts of country "under the exclusive jurisdiction of the United States." This language was sufficiently comprehensive to include, and did include, the District of Columbia; but, as previously noted, while the revision and codification of the Federal criminal laws was in progress, the District of Columbia was given a local Code at law, which necessarily superseded General Statutes then in force. When, therefore, the Federal Code was enacted, the comprehensive jurisdictional language of sec. 5339 of the Revised Statutes gave way to what we conceive to be more restrictive language. The various ways in which the United States might acquire land was well known to Congress. It was equally well known that there are scattered over the United States tracts of land acquired and reserved for the exclusive use of the United States, which are not under its exclusive jurisdiction. Even the National Cemetery at Arlington, having been acquired without the consent of the legislature of the State of Virginia, is not under the exclusive jurisdiction of the United States. *United States* v. *Penn,* 48 Fed. 669. For a comprehensive review of this question, see *Ft. Leavenworth R. Co.* v. *Lowe,* 114 U. S. 525, 29 L. ed. 264, 5 Sup. Ct. Rep. 995; *Benson* v. *United States,* 146 U. S. 325, 36 L. ed. 991, 13 Sup. Ct. Rep. 60. In those cases it was ruled that where lands are acquired by the United States without the consent of the legislatures of the States in which the lands are located, "the possession of the United States, unless political jurisdiction is ceded to them in some other way, is simply that of an ordinary proprietor." We think, therefore, that the words, "and under the exclusive jurisdiction thereof," were advisedly used in said sec. 272, and qualify the preceding words of the paragraph. As the District

of Columbia was not reserved or acquired for the exclusive use of the United States, it follows that it is not within the intent and meaning of this paragraph. There is still further reason for this conclusion. When Congress, in chapter 13, wished to refer to "any place within the exclusive jurisdiction of the United States," it expressly said so.

The question still remains whether sec. 330 of chapter 14 of the Federal Penal Code was intended to apply to the District of Columbia. We think that section coextensive in its application with chapter 11. Under chapter 11, as we have noted, the punishment for rape is death, the jury having the right to qualify their verdict in the respect mentioned. Under the corresponding provision in the District Code, which has not been repealed unless by implication, a different and milder punishment is allowed. Sec. 331, referring to the marshal as the officer charged with the execution of the judgment of death, also indicates that Congress did not have in mind the District of Columbia. Moreover, as previously noted, sec. 330 did not constitute new legislation. It was a mere bringing forward of sec. 1 of said act of January 15, 1897. We have, we think, demonstrated that upon the taking effect of the District Code on January 1, 1902, sec. 1 of said act of 1897 was no longer applicable to the District of Columbia. The Federal Criminal Code was approved March 4, 1909, and became effective on the 1st of January, 1910. For a period of eight years, therefore, a jury was without authority in this jurisdiction to qualify its verdict in the particular manner authorized by said act of 1897. Congress must be presumed to have known this, and yet it has merely brought forward in the Federal Code the provision in the act of 1897, which it knew had not been in force in this jurisdiction for many years. Had Congress intended that this provision should be applicable to this District upon the taking effect of the Federal Code, we think the circumstances were such that it would have said so in plain and unmistakable language.

But there is a still more cogent reason for the conclusion that said sec. 330 has no local application. Chapter 15 con-

tains seven pages of repealing provisions. Apparently every prior enactment of Congress that in any way conflicted with the provisions of this Federal Code was in terms repealed. The act of February 7, 1896, to prohibit prize fighting and pugilism "in the Territories and the District of Columbia," was concluded in the repealing provisions, the act, as we have seen, having become secs. 320 and 321 of chapter 13. These sections were made applicable to the District of Columbia, the revision commission probably overlooking the fact that the same act had been brought forward as sec. 876, of the District Code. [31 Stat. at L. 1332, chap. 854]. Said act of January 15, 1897, permitting the jury to qualify their verdict, was also expressly repealed. In no instance in all these repealing provisions do we find any reference to the District Code. The last paragraph of sec. 341 of these repealing provisions is general, and includes "all other sections and parts of sections of the Revised Statutes and acts and parts of acts of Congress; in so far as they are embraced within *and* superseded by this act, * * * the remaining portions thereof to be and remain in force with the same effect and to the same extent as if this act had not been passed." Here again we find Congress using carefully chosen words. Not only must the acts of Congress have been embraced within the Federal Code, but they must have been superseded by it. Intent was thus made the criterion by which to determine whether the provisions of this Code displaced existing legislation not specifically repealed. We cannot believe that Congress intended to subject the people of this District to the uncertainty and confusion that inevitably would have followed a commingling of the two Codes. Congress, during the preparation of the Criminal Code of the United States, having adopted, amended, and added to a comprehensive local Code, and having in adopting the former, failed expressly to repeal corresponding provisions in the latter,—although careful to repeal all corresponding provisions in the General Statutes of the United States—must be presumed to have intended the local Code to continue in force.

Our attention has been directed to sec. 1639 of the District Code [31 Stat. at L. 1436, chap. 854], which, although adopted on March 3, 1901, did not become effective until January 1, 1902. Said section provides that "the enactment of this Code is not to affect or repeal any act of Congress which may be passed between the date of this act and the date when this act is to go into effect; and all acts of Congress that may be passed hereafter are to have full effect as if passed after the enactment of this Code, and, so far as such acts may vary from or conflict with any provision contained in this Code, they are to have effect as subsequent statutes and as repealing any portion of this act inconsistent therewith." Inasmuch as any act of Congress passed after the Code became effective would, if embracing any of its provisions, supersede such provisions if enacted with that intent, we think it is apparent that Congress was here legislating with respect to acts passed between March 3, 1901, and the 1st of January following. But for such a provision it might have been contended that an act obviously relating to the District of Columbia, but adopted prior to the taking effect of the Code, was of earlier date, and hence subordinate to the corresponding provisions of the Code. But, irrespective of the construction to be placed upon this section, we are convinced that Congress—in bringing forward sec. 1 of said act of January 15, 1897, as sec. 330 of the Criminal Code of the United States—did not intend to affect or supersede secs. 801 and 808 of the District Code [31 Stat. at L. 1321, 1322, chap. 854], prescribing the punishment for the two degrees of murder and for rape. The Federal Code embraces general legislation of general operation; the District Code local legislation of local operation. An intent to affect or repeal the latter by the enactment of the former ought clearly to appear, and will not be implied. *Sullivan* v. *Goldman,* present term, ante, 319. Congress has also given Alaska a comprehensive Code of Criminal Law and Procedure, especially suited to conditions there existing (30 Stat. at L. 1253–1341, chap. 429). This tends further to support our conclusion that

the general provisions of the Federal Code were not intended to affect our local Code.

The judgment must be affirmed.                    *Affirmed.*

An application by the appellant for the allowance of a writ of error to the Supreme Court of the United States was denied March 11, 1912.