William C. COLEMAN, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 17176, 17177.

United States Court of Appeals District of Columbia Circuit.

Argued May 10, 1963.

Decided May 1, 1964.

See also 111 U.S.App.D.C. 210, 295 F.2d 555.

Before BAZELON, Chief Judge, and WILBUR K. MILLER, FAHY, WASHINGTON, DANAHER, BASTIAN, BURGER, WRIGHT and McGOWAN, Circuit Judges, sitting en banc.

DANAHER, Circuit Judge, with whom BAZELON, Chief Judge, and FAHY, WASHINGTON and WRIGHT, Circuit Judges, join:

We are here concerned with two appeals from post-conviction orders. In No. 17176, the appellant on May 17, 1962 filed his notice of appeal from the District Court's order of May 8, 1962, which denied appellant's March 29, 1962 motion to reduce his death sentence to life imprisonment. The motion was based upon Public Law 87–423, *infra* note 8, and Rule 35 of the Federal Rules of Criminal Procedure. In No. 17177, the appellant on June 15, 1962 filed his notice of appeal from the District Court's order of June 8, 1962, which denied appellant's motion to vacate the sentence of death pronounced by trial Judge Letts on June 30, 1960. This latter motion, based upon Rule 35, asserted that the sentence was "unauthorized by law." [1]

Indicted pursuant to D.C.CODE § 22–2401 (1951), the appellant on June 11, 1960 had been convicted of the murder of a police officer while appellant and his brother, Raymond S. Coleman, were perpetrating a robbery.[2] At that time D.C. CODE § 22–2404 (1951) provided that the "punishment of murder in the first degree *shall be death* by electrocution" (emphasis added), and on June 30, 1960, the trial judge pronounced sentence accordingly.[3] After *en banc* consideration of Coleman's appeal, this court on Sep-

Mr. Robert L. Weinberg, Washington, D. C., with whom Mr. Edward Bennett Williams, Washington, D. C., was on the brief, for appellant.

Mr. Barry Sidman, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee.

1. Appellant alleged that the first degree murder sentence should have been determined pursuant to 18 U.S.C. § 1111(b) (1958), rather than under D.C.CODE § 22–2404 (1951); and further, that imposition of the death sentence under the latter section was "constitutionally impermissible and in violation of the due process clause of the Fifth Amendment."

2. Appellant alone was convicted of the "felony murder." Both men were found guilty of the robbery. Raymond S. Coleman did not appeal; we unanimously agreed there was no error in this appellant's conviction of the robbery charge.

3. Judge Letts in his order of judgment provided for a stay of execution pending appeal. We then appointed Mr. Williams to represent the appellant in this court.

tember 8, 1961 affirmed the conviction.[4] Appellant's petition for a writ of certiorari was denied by the Supreme Court on March 5, 1962.[5] Rehearing was denied on April 2, 1962.[6] Thus the appellant's 1960 death sentence was mandatory, final and unreviewable.[7] A reduction of that sentence to life imprisonment might thereafter have been available only by Executive clemency except for possible relief under an intervening Act of Congress which became effective March 22, 1962, and which gives rise to questions hereinafter considered.

## I

The amendatory Act, Public Law 87–423,[8] in the main spoke prospectively in prescribing the death penalty unless a jury by unanimous vote should recommend life imprisonment. If the jury should fail to agree as to punishment, the trial judge was authorized to impose "either a sentence of death * * * or life imprisonment." But Congress was aware that there were pending various cases[9] in which we had affirmed convictions of murder in the first degree wherein death sentences had already been imposed, the execution of which had been stayed pending exhaustion of appellate remedies. Separate provision was therefore made respecting such cases "tried prior to March 22, 1962" as to which relief might become available by action of the judge.[10]

On March 29, 1962, appellant's counsel filed a motion to reduce the sentence to life imprisonment. Following FED.R. CRIM.P. 35 and based upon the proviso of the amendatory Act,[11] the motion invok-

4. In our opinion which appears at 111 U.S. App.D.C. 210, 295 F.2d 555 (1961), various contentions advanced by the appellant received detailed consideration. Importantly it may be noted that the minority held the view that the trial judge should have submitted an instruction on second degree murder. The majority concluded that such an instruction may be justified only when there is evidence of record which will support a finding of guilt in respect to a lesser offense.

5. 369 U.S. 813, 82 S.Ct. 689, 7 L.Ed.2d 613; Mr. Justice Brennan and Mr. Justice Stewart were of the opinion that certiorari should have been granted.

6. Mr. Justice Douglas was then of the opinion that "a response to the petition" should have been requested (369 U.S. 842, 82 S.Ct. 870, 7 L.Ed.2d 847).

7. Jones v. United States, 117 U.S.App.D.C. 169, 327 F.2d 867 (en banc, 1963).

8. Approved March 22, 1962, 76 STAT. 46, D.C.CODE § 22–2404 (Supp. II, 1961); so far as pertinent to our problem the amendatory Act reads:
    "§ 22–2404. Punishment for murder in first and second degrees.
    "The punishment of murder in the first degree shall be death by electrocution unless the jury by unanimous vote recommends life imprisonment; or if the jury, having determined by unanimous vote the guilt of the defendant as charged, is unable to agree as to punishment it shall inform the court and *the court* shall thereupon have juris-

diction to impose and *shall impose either a sentence of death by electrocution or life imprisonment.*
    "Notwithstanding any other provision of law, a person convicted of first degree murder and upon whom a sentence of life imprisonment is imposed shall be eligible for parole *only after the expiration of twenty years* from the date he commences to serve his sentence.
    *    *    *    *    *
    "Cases tried prior to March 22, 1962, and which are before the court for the purpose of sentence or resentence *shall be governed by the provisions of law in effect prior to March 22, 1962: Provided,* That the judge may, in his sole discretion, *consider circumstances in mitigation and in aggravation* and *make a determination as to whether the case* in his opinion *justifies* a sentence of life imprisonment, *in which event he shall sentence* the defendant *to life imprisonment.* Such a sentence of life imprisonment shall be in accordance with the provisions of this Act." (Emphasis added.)

9. Including the instant Coleman v. United States and Jones v. United States, 111 U.S.App.D.C. 276, 296 F.2d 398 (1961), (an en banc affirmance of the Jones conviction), cert. denied, 370 U.S. 913, 82 S. Ct. 1260, 8 L.Ed.2d 406 (1962).

10. See Jones v. United States, *supra* note 7.

11. *Supra* note 8.

ed exercise of the court's discretion "upon consideration of the circumstances in mitigation and in aggravation." However, the motion was addressed simply to points which had already been considered and settled upon direct appeal. The motion alleged, for example, that of "prime importance" was the existence of a "reasonable doubt as to the legal correctness of defendant's conviction of first degree murder." In furtherance of that theme, the motion raised a question of the appropriateness of an instruction as to murder in the second degree. It was suggested as a matter of legislative history that Congress had deemed appropriate here a sentence of life imprisonment on the *facts of the crime* as committed.[12] Counsel so argued the motion, and the Government joined issue in the same tenor, but concluded it was making no "recommendation as to sentence in this case, but only points out that the argument made by the defense motion from the evidence does not have merit."

The motion contained no allegation of fact and no proffer[13] of testimony as to other "circumstances" which might have tended to mitigate the sentence. To be sure, the statute before us contained no requirement that the "circumstances" to be relied upon must be presented by the testimony of witnesses examined in open court as had been true of the Oklahoma statute before the Court in Williams v. Oklahoma.[14] There, a post-conviction inquiry by the Court as to punishment was to be predicated upon the "suggestion of either party that there are circumstances which may be properly taken into view, either in aggravation or mitigation of the punishment."[15] The Oklahoma court had held that the prisoner "waived" the benefit of the statutory proceedings by failing to request a hearing. Since the petitioner had not requested or suggested that the trial court hear evidence in mitigation of the sentence, the Supreme Court of the United States found no deprivation of right or of fundamental fairness in the failure of the trial court to pursue the presentencing procedures prescribed by the Oklahoma statutes.[16] It would come with poor grace, to say the least, if the post-conviction successor judge in our unique situation were to be criticized for proceeding to decide the motion to reduce sentence on the only basis upon which it was proffered to and argued before him. He ruled in accordance with our earlier

12. The Government's reply in turn dealt with the crime since the issue had been so tendered. It should be noted that in some situations the circumstances of the *crime* may be controlling. Robinson v. United States, 324 U.S. 282, 286, 65 S.Ct. 666, 89 L.Ed. 944 (1945).

13. Counsel orally argued in part:
"Again, Your Honor, with respect to the Defendant William Coleman, I know that a number of letters have come to the Court with respect to him from people in his home town who have known him and who have known his family. This man was reared, as you know, in a small town in Virginia in abject poverty. He had minimal schooling; but despite the fact that he had minimal schooling, he was able to secure and hold employment for a long period of time. The record shows that he was employed by the same employer for a period of seven years prior to this offense.
"The record further shows that he has no prior criminal record, Your Honor, with the exception of a disorderly conduct charge, for which he received a ten-day jail sentence at the age of sixteen. But there is no adult criminal record.
"The record further shows, Your Honor, that he did serve honorably in the military for a period of a year between 1956 and 1957, and was discharged under a provision which permitted one-year discharges for members of the military with subnormal intelligence quotients.
"Now, Your Honor, what is the Government's position with respect to this? Because I think this becomes very relevant.
"The Government does not ask Your Honor to exercise your discretion and allow the death penalty to stand. Instead, they have filed a responsive pleading in which they go to some pains to convince Your Honor that the killing of Officer Brereton was a deliberate killing."

14. 358 U.S. 576, 582, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959).

15. *Ibid.*

16. 358 U.S. at 583, 79 S.Ct. 421.

opinion [17] on the merits, that the points urged upon him had been settled.

But he need not have been so limited in view of the purpose of the statute as Congress clearly intended it to be applied as to sentences imposed before its effective date. The appellant's death sentence when imposed in 1960 was "mandatory," [18] with no opportunity for a showing of mitigating circumstances, no matter what the claims might be.

Under that 1962 proviso, however, the judge was authorized to ascertain whether or not a sentence of life imprisonment might be justified, and if so, that sentence was to carry a minimum imprisonment of twenty years. Whereas in cases charging murder in the first degree *after* March 22, 1962, a jury was authorized to recommend life imprisonment, [19] as to the appellant's case a "procedure" was "established whereby" *the judge* was "to consider the circumstances in mitigation and in aggravation." [20]

We can not suppose that a judge in considering circumstances in mitigation was intended to be more narrowly restricted than the jury. [21] We know at once that matters entirely apart from the evidence at a trial may and frequently do—and in proper cases should—affect the punishment to be accorded once the issue of guilt has been resolved, as it had been here. Rule 32(c) provides for a pre-sentence report and specifies its scope to include such information as may be required by the court and "be helpful in imposing sentence." Rule 32(a) provides that the defendant shall be afforded "an opportunity to make a statement in his own behalf and to present any [22] information in mitigation of punishment." While the facts of the crime are not without bearing, the purpose of the proviso of the amendatory Act was directed to the possible existence of circumstances in mitigation, not of the *crime*, per se, but of *punishment*. [23]

---

17. *Supra* note 4.

18. Jones v. United States, *supra* note 7.

19. And in doing so, the exercise of discretion "could be based upon any consideration which appealed to the jury." Andres v. United States, 333 U.S. 740, 743, 68 S.Ct. 880, 881, 92 L.Ed. 1055 (1948), citing Winston v. United States, 172 U.S. 303, 313, 19 S.Ct. 212, 43 L.Ed. 456, (1899).

20. Quotations here are drawn from H.R. REP. No. 677, 87th Cong., 1st Sess. to accompany H.R. 5143.

21. In Winston v. United States, *supra* note 19, 172 U.S. at 313, 19 S.Ct. at 215, the Court said: "The act does not itself prescribe, nor authorize the court to prescribe, any rule defining or circumscribing the exercise of this right; [to qualify a verdict of guilty by adding 'without capital punishment'] but commits the whole matter of its exercise to the judgment and the consciences of the jury." Such undoubtedly was the purpose of those who drafted the amendatory Act which authorized the opportunity for relief in the judge's "sole discretion." And see *generally the debates in the Senate re* H.R. 5143, Vol. 108, Congressional Record, 87th Cong., 2d Sess. 3977–3984, 4116–4146 (1962).

22. The judge obviously is not bound to accept as established every such proffer, but surely he is to consider the facts which have not previously been brought to light and "any other consideration whatever" which "should be allowed weight in deciding the question whether the accused should or should not be capitally punished." Winston v. United States, *supra* note 19, 172 U.S. at 313, 19 S.Ct. at 215; Jones v. United States, *supra* note 7. As to the prisoner's right to allocution, see Green v. United States, *infra* note 23, 365 U.S. at 304, 81 S.Ct. at 655: "The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself," citing Rule 32(a). Cf. United States v. Behrens, 375 U.S. 162, 165, 84 S.Ct. 295, 11 L.Ed.2d 224 (1963).

23. We so used the phrase in Couch v. United States, 98 U.S.App.D.C. 292, 293, 294, 235 F.2d 519, 520, 521 (*en banc* 1956); Walton v. United States, 92 U.S. App.D.C. 26, 202 F.2d 18 (1953); and see Green v. United States, 365 U.S. 301, 304, and compare the expressions appearing at 307, 309, 81 S.Ct. 653, 656, 657, 5 L.Ed.2d 670 (dissenting opinion) (1961).

■ Further to implement the procedure established by the proviso and in aid of the congressional purpose, it is clear the judge was not circumscribed in the inquiry he was intended to make. By the same token previously discussed, he was free to consider circumstances in aggravation. The task of the judge

"is to determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant—if not essential—to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial." [24]

■ To recapitulate, Congress by the pertinent portion of Public Law 87–423 intended to create a mechanism here applicable to a previously convicted murderer by which the judge might determine whether the case "justifies a sentence of life imprisonment." [25] Congress unlike various state legislatures did not adopt a "two-trial" statute.[26] Rather, Congress chose to rely upon the experience, training and expertise of the judge who was to make the appropriate determination "in his sole discretion"— that is, sitting without a jury. The legislative procedure clearly was to be pursued in light of the congressional intent, and due process considerations required an appropriate inquiry as to all factors bearing upon the "fateful choice of sentences." [27] Since such a hearing was not held, we deem the error material. Under Rule 52(b) we must reverse on this ground [28] despite the deficiency, indeed the absence, of factual allegation in the motion for reduction of sentence as presented in the District Court.

## II

■ Trial Judge Letts who had pronounced sentence in 1960, retired on June 1, 1961 at the age of 86. Thereafter, except for previously assigned matters involving his sitting as a "special judge," he undertook no new assignments. Appellant has here for the first time contended that no judge other than trial Judge Letts was competent to hear and act upon his motion to reduce sentence, filed in March, 1962. Neither in that motion for reduction of sentence nor in his later motion to vacate sentence [29] was there a challenge by the appellant to the *authority* of Judge McGarraghy to consider the post-conviction motions. Only in his reply to the Government's answer to the motion to reduce was there a reference to that point. There he argued that even if the motion to reduce sentence were being considered by the judge who had presided at trial, it would be "questionable" for the judge to consider the "facts" as set up in the Government's answer. It was asserted that Judge Letts "did not sit as a trier of fact." Accordingly appellant contend-

24. Williams v. New York, 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949). There, despite the jury's recommendation of life imprisonment, the trial judge imposed a sentence of death. Considerations actuating his conclusion are set forth at 244, 69 S.Ct. at 1081. And see discussion at pp. 249–252, 69 S.Ct. at pp. 1084–1085.

25. "The purpose of the legislation in question is to abolish mandatory capital punishment for first degree murder in the District of Columbia." H.R.REP. No. 677, *supra* note 20, Senate debates, supra note 21. Supplementing our earlier references herein to considerations open to the judge, see Jones v. United States, *supra* note 7, and see note *"Executive Clemency in Capital Cases,"* 39 N.Y.U.L. Rev. 136, 166 (1964).

26. See note *"The Two-Trial System in Capital Cases,"* 39 N.Y.U.L.Rev. 50 (1964).

27. Williams v. New York, *supra* note 24, 337 U.S. at 251, 69 S.Ct. 1079.

28. Especially since life is at stake. Fisher v. United States, 328 U.S. 463, 468, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946).

29. See Part III, *infra.*

**564**

ed that where a successor judge was to hear the motion, it would seem "clearly unreasonable" were such findings to be made by a judge "who did not preside at the trial."

FED.R.CRIM.P. 25 clearly contemplates that if by reason of absence from the District, death, sickness or other disability the judge before whom the defendant has been tried is unable to perform the duties to be performed by the court after a verdict or finding of guilt, any other judge regularly sitting in or assigned to the court may perform those duties. The record shows that Chief Judge McGuire ascertained from Judge Letts "that he was disabled from proceeding" with reference to the appellant's motion. Thus the motion was referred to Judge McGarraghy pursuant to Rule 25 and in accordance with the District Court's practice.[30]

■ Had Judge McGarraghy's authority so to act been challenged in the District Court, it is possible that in essential respects, the record might have been more complete. Appellant's attack in this court not only comes too late, but we find no occasion to look behind the pronouncement in Judge McGarraghy's opinion that he deemed himself competent to act pursuant to Rule 25. There was no suggestion to Judge McGarraghy that he not sit because not himself "satisfied that he cannot perform those duties" devolving upon him as a successor to the trial judge, either because he had not presided at the trial or "for any other reason."[31]

There is nothing in the amendatory Act to suggest that "the judge" who might be asked to consider a post-trial motion for relief must be the trial judge and no other. Appellant on brief here tells us that the instant record showed factors which

"amply afforded an adequate basis for granting appellant's motion

without need to resolve the conflicting testimony bearing on whether the homicide was accidental. It would accordingly have been proper for the successor judge to have granted the motion for reduction of sentence on the basis of his examination of the record; and appellant, of course, would have no standing to complain of such a decision."

We quite agree there was no longer a "need to resolve" conflicts in the testimony. The jury had done so. We further agree that the appellant would have no basis to complain of a favorable decision. The appellant equally lacks "standing" at this point in the proceedings to challenge Judge McGarraghy's qualifications to render his decision, for there was no question on this record which turned upon the credibility of controverted testimony.[32] The plain fact is there had been no post-trial showing by the appellant in mitigation or by the Government in aggravation which, taken together with all "circumstances," might have had an effect upon the sentence. Appellant's reliance upon his interpretation of the applicability of Rule 25 is totally lacking in substance. Judge McGarraghy was not disqualified.

**III**

As here, the appellant's motion to vacate the sentence of death upon constitutional grounds[33] was extensively argued before the District Judge where counsel said: "We are not challenging the conviction in this argument." Rather, counsel insisted that the *sentence* imposed by Judge Letts "went beyond that authorized by the verdict." He contended that under FED.R.CRIM.P. 35 the sentence of death was illegal and therefore should have been reduced to life imprisonment. It was submitted that the provisions of the federal stat-

---

30. Chief Judge McGuire filed a memorandum to that effect which was supplied for "the record."

31. FED.R.CRIM.P. 25.

32. Cf. Connelly v. United States, 249 F.2d 576, 580 (8 Cir. 1957), *cert. denied*, 356 U.S. 921, 78 S.Ct. 700, 2 L.Ed.2d 716 (1958).

33. See note 1 *supra*.

ute, 18 U.S.C. § 1111(b), should have governed and should have been applied.[34]

■ We do not agree, for the federal statute clearly is designed to apply within "the special maritime and territorial jurisdiction of the United States" which, in turn, is defined, as here pertinent, in 18 U.S.C. § 7(3).[35] The prosecution here went forward pursuant to D.C.CODE § 22–2401 (1951), 54 STAT. 347.

The robbery had its inception in a liquor store wherein were located police officers who immediately commenced pursuit of the appellant across a public street in the District of Columbia. It was in the course of that pursuit that the police officer was murdered in a nearby alley, as detailed in our opinion.[36] The area by no tenable construction can be said to have been within "the special maritime and territorial jurisdiction of the United States." This court had occasion to consider and reject a not dissimilar contention in Johnson v. United States.[37] The Supreme Court on appeal noted that the 1897 statute which conferred authority on a jury to qualify its verdict and which had been held applicable to the District of Columbia in Winston v. United States,[38] had been deleted from the District Code, effective January 1, 1902.

The Court held, in short, that the federal statute and the District Code were separate instruments. It was pointed out that the effect of the "separation is important and necessarily had its purpose." The opinion went on to explain:

"The Codes had in the main special spheres of operation, and provisions accommodated to such spheres. There is certainly nothing anomalous in punishing the crime of murder differently in different jurisdictions. It is but the application of legislation to conditions. But if it be anomalous, very little argument can be drawn from it to solve the questions in controversy. The difference existed for a number of years between the District and other places under national jurisdiction, for, as we have seen, the qualified verdict has not existed in the District since the enactment of the District Code, and did not exist when the Criminal Code was enacted. There is certainly nothing in the mere act of enacting that code which declares an intention to give to the provision conferring power on a jury to qualify their verdict greater efficacy against the Code of the District than the same provision in the act of January 15, 1897, possessed." [39]

The Court, in different context but nonetheless cogently, reemphasized the distinctive position of the District of Columbia in matters of criminal law in Griffin v. United States.[40] There the Court pointed out:

"This Court, in its decisions, and Congress, in its enactment of statutes, have often recognized the appropriateness of one rule for the District and another for other jurisdictions so far as they are subject to federal law. Thus, the 'federal rule' in first-degree murder cases is that,

---

34. 18 U.S.C. § 1111(b) (1958):

 "(b) Within the special maritime and territorial jurisdiction of the United States,

 "Whoever is guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto 'without capital punishment', in which event he shall be sentenced to imprisonment for life * * *."

35. "Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dock yard or other needful building."

36. *Supra* note 4.

37. 38 App.D.C. 347, 357, *aff'd*, 225 U.S. 405, 416, 32 S.Ct. 748, 56 L.Ed. 1142 (1912).

38. 172 U.S. 303, 19 S.Ct. 212 (1899).

39. Johnson v. United States, *supra* note 37, 225 U.S. at 417–418, 32 S.Ct. at 752.

40. 336 U.S. 704, 69 S.Ct. 814, 93 L.Ed. 993 (1949).

unless the jury by unanimous vote agrees that the penalty should be death, the court must fix the sentence at imprisonment for life. 35 Stat. 1151, 1152, 18 U.S.C. § 567, now 18 U.S.C. § 1111 (1948), Andres v. United States, 333 U.S. 740. But a defendant convicted of first-degree murder in the District cannot look to the jury to soften the penalty; he must be given the death sentence. 31 Stat. 1321, 43 Stat. 799, D.C.Code § 22–2404, Johnson v. United States, 225 U.S. 405. Furthermore, the Court's decision in Fisher v. United States, 328 U.S. 463, makes clear that when we refused to reverse the Court of Appeals for the District we were not establishing any 'federal rule' in interpreting the murder statutes which apply in places other than the District of Columbia over which Congress has jurisdiction. In fact, this Court has been at pains to point out that 'Congress * * * recognized the expediency of separate provisions' pertaining to criminal justice applicable exclusively to the District of Columbia in contradistinction to the Criminal Code governing offenses amenable to federal jurisdiction elsewhere. Johnson v. United States, 225 U.S. 405, 418." [41]

The trial judge fully considered and sufficiently dealt with the contentions in such respects, as the record shows. He correctly concluded that the prosecution and the sentence had been predicated upon the provisions of the District Code. In his denial of the motion to vacate sentence there was no error.

## IV

Because the amendatory Act of 1962 was unique and its applicability to this case was a matter of first impression in the District Court, we have extensively explored its impact. We remand only that the judge may conduct an inquiry and the appellant be afforded a hearing pursuant to and as discussed in Part I, supra.

Remanded for further proceedings consistent with this opinion.

WRIGHT, Circuit Judge, with whom BAZELON, Chief Judge, and FAHY, Circuit Judge, join, concurring:

I concur in the court's excellent opinion and the result therein reached. I would only add that in my view Public Law 87–423 requires resentencing of the defendant. See Jones v. United States, 117 U.S.App.D.C. 169, 327 F.2d 867, 876–878 (1963) (en banc) (concurring opinion).

BURGER and McGOWAN, Circuit Judges, concurring in the result:

We concur in the remand, but we can find no basis in this record, read in light of the statute and its legislative history, to support reversal on the ground upon which the majority relies. We think a remand necessary only because appellant was not affirmatively tendered an opportunity to speak on his own behalf. Although the point was not raised on appeal, it cannot be ignored in a capital case, which affords a special status to the right of allocution.

### (1)

Appellant, represented by counsel highly experienced in criminal matters, had an unlimited opportunity to present to the District Court in mitigation whatever information, evidence or argument he desired. We can see no difference between this and the undefined "evidentiary hearing" now directed.

We are, of course, dealing here with the special provisions of a statute, 22 D.C.Code Ann. § 2404 (Supp. II 1963), addressed by Congress to those cases in which unexecuted death sentences had been imposed in the District of Columbia before the change in the law eliminating the mandatory character of this particular punishment. 22 D.C.Code Ann. § 2404 (1961). We find no mystery as to

41. *Id.* 336 U.S. at 712–713, 69 S.Ct. at 818.

the process which Congress intended should be employed in these circumstances. Upon motion made pursuant to the amendatory Act, the District Court was to hold a hearing in order to be able to exercise an informed discretion in determining whether the sentence should be the death sentence already imposed or life imprisonment. At such hearing the District Court was to listen to all representations seriously advanced with respect to the alternatives; to receive all relevant evidence tendered; and thereafter to choose between the two available sentences. Our reading of the record fails to disclose that the District Court departed from this procedure.

At a hearing in open court, the District Judge very carefully refused to begin until appellant himself was present. Counsel for appellant, obviously sensitive to his grave responsibility, made a long and impressive statement which incorporated significant factual information relating to appellant's personal life and background. Counsel was not restricted in any way, either as to the length or content of his argument. Had he chosen to offer corroborative matter by way of documentary or testimonial evidence, nothing in the record indicates that it would not have been received. We do not intend any criticism of counsel for not having proffered such evidence; it was his responsibility to decide what should be presented. His statements about the facts of appellant's life and background were unchallenged. Further, in this as in other areas of our jurisprudence, the client's protection must depend primarily upon his attorney's strategic wisdom and tactical skill—his familiarity with all the facts, good and bad, from which his presentation may be drawn. Counsel was here engaged in the most sobering effort at persuasion that can devolve upon any lawyer. The majority opinion, by implication at least, seems to suggest that appellant will be better served if the District Court actively undertakes the conception and development of this effort. We doubt this; and, in any event, Congress has not directed judicial intervention of this nature by the presiding judge.

(2)

When Coleman was first sentenced by Judge Letts on June 30, 1960, after verdict and judgment of guilty for first degree murder, the District Court was bound by the then existing mandatory death sentence. 22 D.C.CODE ANN § 2404 (1961).[1] Before imposing the mandatory death sentence required by law, Judge Letts, pursuant to Rule 32 (a),[2] allowed appellant to make a statement, but it is clear that, under the mandatory statute then controlling, such statement could not have influenced the result.

On March 22, 1962, Congress amended the D.C.Code to provide alternatives to the death sentence for subsequent first degree murder convictions. 22 D.C.CODE ANN. § 2404 (Supp. II 1963). See Jones v. United States, 117 U.S.App.D.C. ——, 327 F.2d 867, 870–871 (1963). This Act provided further that as to cases tried prior to March 22, 1962, which are before the court for resentencing, "the judge may, *in his sole discretion*, consider circumstances in mitigation and in aggravation and make a determination as to whether the case in his opinion justifies a sentence of life imprisonment, in which event he shall sentence the defendant to life imprisonment." 22 D.C. CODE ANN. § 2404 (Supp. II 1963). (Em-

1. Coleman's conviction was affirmed by this court and he exhausted all appellate procedures in this court and the Supreme Court. Coleman v. United States, 111 U.S.App.D.C. 210, 295 F.2d 555 (Sept. 8, 1961) (en banc), *pet. for rehearing en banc denied* (Oct. 10, 1961), *cert. denied*, 369 U.S. 813, 82 S.Ct. 689, 7 L.Ed.2d 613 (March 5, 1962), *pet. for rehearing de-* *nied*, 369 U.S. 842, 82 S.Ct. 870, 7 L.Ed. 2d 847 (Apr. 2, 1962).

2. FED.R.CRIM.P. 32(a) provides in part: "Before imposing sentence the court shall afford the defendant an opportunity to make a statement in his own behalf and to present any information in mitigation of punishment."

phasis added.) In Jones v. United States, *supra*, we held that sentences imposed prior to the effective date of the amendatory Act were not vacated by that Act; however, we stated that "should [the judge] decide that life imprisonment was appropriate he was to resentence appellant * * *." 327 F.2d at 871. Thus "resentencing" would occur only when the original sentence is altered.

On March 22, 1962, the effective date of the amendatory Act, appellant filed in the District Court a motion styled "Motion For Reduction Of Sentence To Life Imprisonment" pursuant to the "resentencing" provision of the amendatory Act and FED.R.CRIM.P. 35. This was not an accurate characterization of a motion addressed to the District Court's discretion under this statute, but the caption of a motion does not determine its essential nature.[3] This motion, insofar as it was filed pursuant to Rule 35, was indeed one for reduction of sentence, in the sense that it sought a lesser sentence than death, but as to the amendatory Act it was a motion praying that the court "consider circumstances" which might lead to resentencing appellant to life imprisonment. See Jones v. United States, *supra*. On May 4, 1962, the motion was argued before the District Court in appellant's presence.[4]

Although appellant's attorney made extensive representations on appellant's behalf, he did not request that appellant be allowed to speak. Notwithstanding this, we believe that judicial policy calls for an opportunity for appellant to speak; when so much is at stake, "[t]he most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." Green v. United States, 365 U.S. 301, 304, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961). Although the particular statute under which the District Court's discretion was invoked does not expressly provide for a right of allocution, it is probable that Congress, in light of the historic standing of allocution—particularly in capital cases—and its more modern codification in Rule 32(a), passed the amendatory Act with the expectation that allocution would be accorded.[5]

Moreover, this court, pursuant to its supervisory powers, has directed that under FED.R.CRIM.P. 32(a) a sentencing judge in all cases must address an inquiry directly to a defendant in order "to afford him a personal opportunity to make a statement in his own behalf, which might include information in mitigation of punishment." Couch v. United States, 98 U.S.App.D.C. 292, 294, 235 F.2d 519, 521 (1956) (per curiam).[6]

3. Rubenstein v. United States, 227 F.2d 638, 642 (10th Cir. 1955), *cert. denied*, 350 U.S. 993, 76 S.Ct. 542, 100 L.Ed. 858 (1956):
> There is no controlling magic in the title, name, or description which a party litigant gives to his pleading. The substance rather than the name or denomination given to a pleading is the yardstick for determining its character and sufficiency.

4. "The defendant's presence is not required at a reduction of sentence under Rule 35." FED.R.CRIM.P. 43. The logical corollary of this proposition would be that FED.R.CRIM.P. 32(a), note 2, *supra*, would not entitle a defendant to allocution on a motion for reduction of sentence. The same reasoning would not necessarily apply to a motion for resentencing, however. *Cf.* United States v.

Behrens, 375 U.S. 162, 84 S.Ct. 295, 11 L.Ed.2d 224 (1963); Williamson v. United States, 265 F.2d 236, 239 (5th Cir. 1959).

5. The right of allocution did not, of course, spring into being with Rule 32 (a); its ancient origins derive from capital cases in which failure of the sentencing judge to ask the defendant if he had anything to say before imposition of sentence required reversal. See, *e. g.* Anonymous, 3 Mod. 265, 87 Eng.Rep. 175 (K.B. 1689) (alternative ground); Barrett, *Allocution*, 9 Mo.L.Rev. 115 (1955).

6. *Compare* Gadsden v. United States, 96 U.S.App.D.C. 162, 167–168, 223 F.2d 627, 632–633 (1955) (alternative ground), *with* Hudson v. United States, 97 U.S. App.D.C. 153, 229 F.2d 36 (1956) (per curiam).

The Supreme Court has since approved this rule.[7] Literally read, of course, *Couch* and the Supreme Court cases apply only to sentencing, and, although consideration whether or not to resentence appellant to life imprisonment is not strictly a "sentencing" process, it seems to us that the rationale of those cases applies with equal force here. Viewed realistically, the hearing presented appellant's first meaningful opportunity to be heard personally by way of a plea for leniency, since this was the first occasion when he was before a judge who had any choice as to sentence on the first degree murder conviction. Thus, at this point, before the District Judge decided whether to allow the prior sentence of death to stand or to resentence appellant to life imprisonment, appellant had not only his first but his last opportunity to make, in his own behalf, some statement that might influence the decision of the District Judge on the death sentence. The Supreme Court said recently, although in another context: "It is only [when final sentence is determined] * * that the judge's final words are spoken and the defendant's punishment is fixed. It is then that the right of the defendant to be afforded an opportunity to make a statement to the judge in his own behalf is of most importance. * * * This

right [of allocution] would be largely lost * * * if for administrative convenience the defendant were not permitted to invoke it when the *sentence that counts* is pronounced." United States v. Behrens, 375 U.S. 162, 165–166, 84 S.Ct. 295, 297 (1963). (Emphasis added.) And as Mr. Justice Harlan said, concurring in the same case: "Even if he has spoken earlier, a defendant has no assurance that when the time comes for final sentence the district judge will remember the defendant's words in his absence and give them due weight." *Id.* 375 U.S. at 168, 84 S.Ct. at 298 (concurring opinion).[8]

Having in mind, as we have noted, that Coleman's exercise of his right to speak before Judge Letts imposed sentence was pointless because the statute then controlling required the death penalty, we conclude that Coleman has not yet been afforded the meaningful opportunity contemplated by prior opinions to address himself personally to the court empowered to make the decision "that counts."

WILBUR K. MILLER and BASTIAN, Circuit Judges, dissent from the majority opinion and from the concurring opinions. They would affirm the judgment of the District Court.

---

7. See Green v. United States, *supra* at 305 (principal opinion) (dictum), 306, 81 S. Ct. at 655, 656 (concurring opinion expressly adopting *Couch*); Van Hook v. United States, 365 U.S. 609, 81 S.Ct. 823, 5 L.Ed.2d 821 (1961) (per curiam reversal and remand on the authority of the *Green* dictum; characterized in Hill v. United States, *infra* at 429 n. 6); Hill v. United States, 368 U.S. 424, 426, 82 S. Ct. 468, 470, 7 L.Ed.2d 417 (1962) (dictum):

   "Although there was no Court opinion in the *Green* case, eight members of the Court concurred in the view that Rule 32(a) requires a district judge before imposing sentence to afford every convicted defendant an opportunity personally to speak in his own behalf.

The ninth Justice in *Green*, Mr. Justice Stewart, in a concurring opinion agreed on the desirability of the practice, although doubting that Rule 32(a) required the procedure in every case. He stated: "But I do think the better practice in sentencing is to assure the defendant an express opportunity to speak for himself, in addition to anything that his lawyer may have to say. I would apply such a rule prospectively, in the exercise of our supervisory capacity." Green v. United States, *supra* 365 U.S. at 306, 81 S.Ct. at 656 (concurring opinion).

8. Especially is this so when as here the first sentence was imposed by a judge other than the one later considering the possibility of imposing a sentence different from the death penalty.