Eddie M. HARRISON, Appellant,

v.

UNITED STATES of America, Appellee.

Orson G. WHITE, Appellant,

v.

UNITED STATES of America, Appellee.

Joseph R. SAMPSON, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 17991–17993.

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 18, 1963.

Reargued en Banc June 15, 1965.

Opinions Released Dec. 7, 1965, Coincident with Opinion on Rehearing en Banc.

Mr. Alfred V. J. Prather, Washington, D. C., with whom Mr. George J. Thomas, Washington, D. C. (both appointed by this court), was on the brief, for appellant in No. 17991. Messrs. Charles A. Miller, Washington, D. C., and Thomas B. Donovan, Washington, D. C., were also on the brief for appellant in No. 17991.

Mr. Thomas H. Wall, Washington, D. C., with whom Mr. Ronald N. Cobert, Washington, D. C. (both appointed by this court), was on the brief, for appellant in No. 17992.

Mr. Monroe Oppenheimer, Washington, D. C. (appointed by this court), with whom Mr. I. William Stempil, Washington, D. C., was on the brief, for appellant in No. 17993.

Mr. William H. Willcox, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty. at the time the brief was filed, and Frank Q. Nebeker and Frederick G. Smithson, Asst. U. S. Attys., were on the brief, for appellee. Mr. B. Michael Rauh, Asst. U. S. Atty. at the time the record was filed, also entered an appearance for appellee in No. 17991.

After the opinions of the judges in the sitting division had been considered, the court *sua sponte* ordered rehearing en banc as to one issue, as hereinafter appears.

PER CURIAM:

These appeals from judgments of conviction in the District Court came on to be heard before a division of the court consisting of Senior Circuit Judge Wilbur K. Miller and Circuit Judges Washington

and Danaher. The opinions of the respective members of that division require reversal of the convictions, and the order of this court in that result is unanimous.

The issue discussed in part III, C of Judge Danaher's opinion, was made the subject of a rehearing en banc. On June 1, 1965, the court entered the following order with respect to Harrison v. United States, No. 17991:

### ORDER

It is ORDERED *sua sponte* by the court *en banc* that the above-entitled case shall be reheard by the court *en banc* on Tuesday, June 15, 1965. The rehearing shall be limited to the issue of the admissibility of the oral admissions of Harrison made at the District of Columbia Jail on March 21, 1960. Cf. Harling v. United States, 111 U.S.App.D.C. 174, 295 F.2d 161 (en banc, 1961).

Per Curiam

Dated: June 1, 1965

Although a majority of the sitting division would have considered that Harrison's oral statements as mentioned in the order might have been received in evidence at a new trial, a majority of the court en banc has ruled otherwise as more fully appears in the opinions that follow.

The convictions are reversed.

So ordered.

Dated: December 7, 1965

The opinions of the judges of the original division follow.

Before WILBUR K. MILLER, Senior Circuit Judge, and WASHINGTON* and DANAHER, Circuit Judges.

DANAHER, Circuit Judge:

An indictment filed April 19, 1960 charged the appellants with murder in the first degree, the first count alleging premeditated murder, and the second charging that on or about March 8, 1960, they murdered one George H. Brown "by means of shooting him with a shotgun, while attempting to perpetrate the crime of robbery." The first count was dismissed. The jury on May 8, 1963 found all three appellants guilty of "felony-murder" and recommended life imprisonment for each.[1]

About 9 A.M. on March 8, 1960, the victim Brown, a gambler, answered a knock at the front door of his house at 1713 Fourth Street, N.W., here in the District. He was met by a blast from a sawed-off shotgun which Harrison had concealed under his trench coat. The gunshot minutely fractured Brown's face on the right side, destroyed the right eyeball and macerated his brain. Brown's body fell against the front door.[2] White and Harrison who had gone to Brown's house intending to rob him, thereupon turned and ran to a waiting get-away car driven by Sampson. The three men then escaped. Additional facts will be interpolated as we turn to the grounds upon which appellate relief is sought.

I

■ The appellants were first convicted on October 19, 1960, and on April 21, 1961 had been sentenced to death by electrocution while represented by an impostor, one Daniel Jackson Oliver Wendel Holmes Morgan.[3] The appellants now assert that they were twice placed in jeopardy since this court, *sua sponte*, and

---

* Circuit Judge Washington became Senior Circuit Judge on November 10, 1965.

1. The sentence was authorized by D.C. CODE § 22–2404 (Supp. IV, 1965). As to background re the amendment, see Jones v. United States, 117 U.S.App.D.C. 169, 327 F.2d 867 *(en banc,* 1963); Coleman v. United States, 118 U.S.App.D.C. 168, 334 F.2d 558 *(en banc,* 1964).

2. Police who shortly responded discovered that the front door had become locked, with the body of the "huge" Brown against the door. A large "roll" of money was on his person.

3. Morgan was later convicted of various offenses more particularly enumerated in our opinion affirming his conviction, Morgan v. United States, 114 U.S.App.D.C. 13, 309 F.2d 234 (1962), cert. denied, 373 U.S. 917, 83 S.Ct. 1306, 10 L.Ed.2d 416 (1963).

over objections by the appellants had ordered a second trial. We do not agree, for in legal effect the so-called "first" trial was a nullity, as will be realized from our noting the bizarre circumstances which impelled our order.

Morgan was not an attorney, but an ex-convict who had taken the name of an absentee attorney, L. A. Harris, who was in fact a member of the bar. Morgan, alias Harris, had purported to represent White and Sampson throughout the first "trial" in September and October, 1960. Harrison then was repre-sented by an attorney who later died whereupon Morgan undertook also to represent Harrison. After the judgment of conviction and sentence, an appeal for all three accused had been brought to this court. While that "appeal" was pending, the Morgan masquerade was discovered. When informed of such facts, and completely satisfied that the appellants had been denied their right to the effective assistance of counsel, we remanded the case to the District Court that it might entertain a motion for a new trial.

But new counsel then representing the appellants refused to move for a new trial, undoubtedly on the assumption that a double jeopardy plea might survive the procedural impasse. This court thereupon declined to further any such strata-gem; we directed that the judgments of conviction be vacated. We had concluded under all the circumstances that there was a manifest necessity for our action lest the ends of public justice be defeated.[4] Surely these accused in a capital case were entitled to a "full defense by counsel learned in the law,"[5] rather than to representation by Morgan. Granting that "[e]ach case must turn on its facts,"[6] we found the reasons here "compelling"[7] for the action we directed.

The Government then went forward with the trial leading to the convictions now under review. The plea of former jeopardy must fail.

## II

Appellants contend they were denied their right to a speedy trial. Following their first appeal, they could have been tried in the Fall of 1961 if they had followed this court's original suggestion that they move for a new trial. They refused to do so, and as noted, *supra*, this court, *sua sponte*, was obliged to reinstate the appeals and, on June 12, 1962, to enter an order vacating the original judgments of conviction. That order was filed in the District Court July 3, 1962. The District Court then assigned the case for trial on October 17, 1962. By that date there had been hearings on motions of various court-appointed counsel for leave to withdraw; Harrison had no attorney; Attorney David, appointed October 30, 1962, thereafter sought a continuance contending that he had no transcript of the first trial; Harrison then moved that Attorney David be discharged; motions to dismiss on double jeopardy grounds had been filed and argued; in short, on one basis or other, the District Court was occupied with a series of defense motions, some purportedly of substance, some procedural, but all contributing to delay.

The unique problems stemming in the first place from Sampson's and White's having engaged the impostor Morgan gave rise to the several dilatory moves. No prejudice in fact was shown. Nor were the "circumstances" such as to deprive the appellants of constitutional rights.[8]

## III

Our next inquiry involves inculpatory statements attributed to the respective

4. United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824); cf. Scott v. United States, 91 U.S.App.D.C. 232, 202 F.2d 354, cert. denied, 344 U.S. 879, 73 S.Ct. 176, 97 L.Ed. 681 (1952) and cases cited.

5. 18 U.S.C. § 3005 (1958).

6. Downum v. United States, 372 U.S. 734, 737, 83 S.Ct. 1033, 1035, 10 L.Ed.2d 100 (1963).

7. Gori v. United States, 367 U.S. 364, 368, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961).

8. Smith v. United States, 118 U.S.App.D.C. 38, 331 F.2d 784 (*en banc*, 1964), and cases therein considered.

appellants. We may first set forth briefly the evidence at hand as of the day of the crime.

Across from Brown's house on March 8, 1960 lived a Mrs. McCoy. Between 9 and 9:30 A.M., she heard "this loud noise go off" and ran into the street. She saw "two boys coming out" of Brown's house, and one of them "put something under his coat, a gun."

One Thomas Young had breakfast that morning at Keys' Restaurant. He sat in a booth with Brown until both left the restaurant about 9 o'clock. Then Brown entered his car. In the restaurant Young had seen a man [9] who was looking at him and Brown. He noticed that the man came from the restaurant as Young and Brown left the premises. He saw that man get into a black Buick car parked near the restaurant. Two other people were in the car. Within a short time Young learned of the attack upon Brown and called the police.

Such was the scanty evidence known to the police shortly after their gaining access to Brown's house and their discovery of his body wedged against the front door. Police investigation went forward immediately.

Later that same day officers questioned these appellants concerning their possible connection with the crime. As the police sought information from Harrison, he told an officer his name and his address, and then added "I don't have to tell you anything else, you can go to hell." All three appellants then denied knowledge of the killing. After having been detained overnight, all three appellants were released.

### A.

Some time in the afternoon of March 20, 1960, police went to Sampson's house looking for him but he was not there. About 6 P.M., Sampson telephoned to Headquarters and stated to Captain Daly that he understood the police had been looking for him and that he was then at home. Two officers were sent for him.

They handcuffed Sampson and brought him to Headquarters. Questioned by Captain Daly, Sampson, commencing about 6 P.M., supplied answers which implicated White and Harrison but which likewise tended to exculpate himself. While Captain Daly was typing up a report of what Sampson had said, White was brought in and was told what Sampson had first said.

White replied "If that is what Sampson said, it is not true, you better talk to him some more." Throughout the evening of March 20, 1960 the questioning of White and Sampson proceeded until, commencing at about 10:30 P.M., Sampson orally submitted an amended version of the part he had played in the crime. Typing of his inculpatory statement commenced around 10:45 P.M. and was completed shortly before midnight. Sampson ultimately was booked at 1:30 A.M. on March 21, 1960. Asked if it was his "purpose in questioning Sampson" to obtain admissions relating to the crime, Captain Daly answered "Yes."

In like manner White at about 10:30 P.M. commenced a statement, the typing of which was completed by Detective Pixton around 11:45 P.M. Thereafter White accompanied the officers to premises at 1511 Newton Street, N.E. as police sought to locate the shotgun which White stated had been put down an incinerator. The gun was not found, for the incinerator had been cleaned out before police reached the spot. White was booked at about 1:29 A.M. on the morning of March 21, 1960.

Not until later in the forenoon of March 21, 1960 were White and Sampson brought before the United States Commissioner.

At the trial the confessions by Sampson and White were received in evidence. The rule laid down in Mallory v. United States [10] has been deemed in some situations not to require exclusion of a voluntary confession forthcoming in

---

9. Later to be identified as Sampson.

10. 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

the course of an essential investigation.[11] Had Sampson's presence and participation been voluntary, "it is well established that the *Mallory* rule is inapplicable."[12] But in light of various rulings which derived from the particular circumstances of yet other cases, the Government in this court conceded on brief that Sampson's confession should not have been received because of "the length of the interrogation that preceded the incriminating statements." We think because of the record here presented the same is true of White's confession. Under control of the police throughout the evening of March 20, 1960, he had been detained at Headquarters while being questioned; he was then after confessing taken out to where the gun had been disposed of, and was not finally booked until about 1:29 A.M. on the 21st. We think the situation as to White is clearly analogous to that disclosed in Seals v. United States,[13] and hence his confession also should have been excluded.

### B.

■ Additionally, the Government offered in evidence statements taken from Sampson and White by jail classification officers. At one time this court had thought that such statements might be received in evidence.[14] But a division of this court (one judge dissenting) has latterly held otherwise in Killough v. United States.[15] We deem ourselves bound to follow that ruling.[16]

It follows that the convictions of Sampson and White must be reversed on the ground that their confessions to the police and their statements to the jail classification officers should not have been received in evidence.

### C.

A different situation is presented with respect to Harrison's oral admissions at the jail and his later written confession. He was not present at Headquarters when Sampson and White confessed. He was already in jail on March 21, 1960 under circumstances we may next describe. On March 19, 1960, one Edith E. Penn swore to a complaint in the Court of General Sessions where she charged Harrison with breaking and entering her apartment on March 18, 1960 and with the theft of $32 and various articles of personal property. Harrison waived hearing, and bail was fixed at $5,000. He was committed to jail to await grand jury action and was later indicted in Criminal No. 364–60. Also on March 19, 1960, Harrison had been convicted and sentenced to jail on three traffic charges growing out of violations on March 18, 1960. He had become 18 years of age on March 18, 1960 so that in neither of the foregoing cases had he been charged in the Juvenile Court, nor had he been charged with the Brown homicide in any court. Thus his incarceration on March 19, 1960 and over the subsequent period so far as is here relevant, was in no way related to the crimes involved in the instant case.

The record shows that about 7:30 A.M. on March 21, 1960, Captain Daly and two detectives brought Sampson and White to the jail. They filled out a visitor's re-

11. See, e.g., United States v. Vita, 294 F. 2d 524 (2 Cir.1961), cert. denied, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962); and Scarbeck v. United States, 115 U.S.App.D.C. 135, 152, 317 F.2d 546, 563 (1962), cert. denied, 374 U.S. 856, 83 S.Ct. 1897, 10 L.Ed.2d 1077 (1963), and cases there cited.

12. Scarbeck v. United States, *supra* note 11.

13. 117 U.S.App.D.C. 79, 81–82, 325 F.2d 1006, 1008–1009 (1963), cert. denied, 376 U.S. 964, 84 S.Ct. 1123, 11 L.Ed.2d 982 (1964); cf. Naples v. United States, 113 U.S.App.D.C. 281, 284, 307 F.2d 618, 621 (*en banc*, 1962).

14. Tyler v. United States, 90 U.S.App.D.C. 2, 9, 193 F.2d 24, 31 (1951), cert. denied, 343 U.S. 908, 72 S.Ct. 639, 96 L.Ed. 1326 (1952).

15. 119 U.S.App.D.C. 10, 336 F.2d 929 (1964).

16. Harrison's statement to a jail classification officer is likewise inadmissible, but the circumstances as to Harrison, generally, will be the subject of separate reference, *infra*, part III, C.

quest form seeking Harrison's consent to an interview and he agreed. Harrison then was brought by a jail attendant to the rotunda where the police told Harrison that Sampson and White had been charged with the murder of Brown, that they had told the complete story to the officers and had implicated him. Harrison asked: "Well, what did they tell you?"

Thereupon, addressing Harrison, Sampson told Harrison what *he* had said to the police. Likewise, White told Harrison what had been said in *his* statement and the part "that he said Harrison had played." Harrison then stated that what Sampson and White had said was true; "that he had fired the gun through the window; at the time he fired it White was standing on the steps behind him."

The officer then asked Harrison "if he wanted to make a complete statement as to the part he did play in this robbery and homicide and he said yes, that he would." Thereupon, Harrison narrated the development of the plan to rob Brown, the steps taken to effectuate that plan, and his arrangement to borrow a car. He told of his carrying a sawed-off shotgun under his coat, and of other particulars involved in his shooting of Brown. He claimed that as Brown had slammed the door in his face, the glass on the door had hit the shotgun which was thus discharged.[17] We need not supply other details. Harrison's oral admissions were properly received against him.

In the first place, there has been shown no fact of record even tending to estab-lish that Harrison's admissions were not freely and voluntarily forthcoming. The *Mallory* rule which requires the exclusion of Sampson's confession and White's confession from being used in criminal proceedings against them is no bar to their telling Harrison what they had told the police. Here was no set of admissions by Harrison induced by police misrepresentation or fraud.[18] With a jail attendant present at all times, with no coercive questioning by police, with no suggestion of police duress, Harrison knew that the co-accused to his face had told the truth, and thus he offered his version of the crime. From other evidence in the case it is clear that Harrison definitely had on his mind the shooting aspect as distinguished from other phases. He told one Valentine that he had shot "Cider" Brown. He had told one Stevenson that he had gone to Brown's house to pawn the gun and that "the man slammed the door on the gun and the gun went off." As Professor Wigmore observed:

> "The nervous pressure of guilt is enormous; the load of the deed done is heavy; the fear of detection fills the consciousness; and when detection comes, the pressure is relieved; and the deep sense of relief makes confession a satisfaction. At that moment, he will tell all, and tell it truly." [19]

In Smith v. United States,[20] this court held that the testimony of one Holman, an eyewitness to the crime, might be received in evidence against Smith even though Holman's identity had been

17. The Government did not contend that the actual discharge of the shotgun was other than accidental but argued, correctly, that even so, that fact was immaterial since the shooting occurred during the perpetration of a felony. Coleman v. United States, 111 U.S.App.D.C. 210, 214, 295 F.2d 555, 559 (*en banc*, 1961), cert. denied, 369 U.S. 813, 82 S.Ct. 689, 7 L.Ed.2d 613 (1962); cf. Wheeler v. United States, 82 U.S.App.D.C. 363, 165 F.2d 225 (1947), cert. denied, 333 U.S. 829, 68 S.Ct. 448, 92 L.Ed. 1115 (1948).

18. Cf. Hawkins v. United States, 81 U.S.App.D.C. 376, 158 F.2d 652 (1946), cert. denied, 331 U.S. 830, 67 S.Ct. 1347, 91 L.Ed. 1844 (1947). There police had informed the appellant that his relatives were being questioned.

19. 3 WIGMORE, EVIDENCE § 851, at 319 (3d ed. 1940).

20. 117 U.S.App.D.C. 1, 324 F.2d 879 (1963), cert. denied, 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964); and see Williams v. United States, 272 F.2d 822 (6 Cir. 1959), cert. denied, 364 U.S. 836, 81 S.Ct. 72, 5 L.Ed.2d 61 (1960); cf. Payne v. United States, 111 U.S.App.D.C. 94, 294 F.2d 723, cert. denied, 368 U.S. 883, 82 S.Ct. 131, 7 L.Ed.2d 83 (1961).

learned during the illegal detention of Smith, as its source. We are satisfied that there was no error in receiving in evidence Harrison's oral admissions given in the presence of Sampson and White, quite irrespective of the status of their own confessions.

Harrison additionally contends that his oral admissions at the jail were excludable because of our holding in Harling v. United States.[21] There we were concerned with the admissibility of damaging oral statements made by Harling while in police custody when he was seventeen years old and before the Juvenile Court had waived jurisdiction. He had admitted participation in the robbery after which he was returned to the Receiving Home to await hearing before the Juvenile Court. We observed that under the applicable statutes impairment of the *parens patriae* function must be avoided. "This requires that admissions by a juvenile in connection with the non-criminal proceeding be excluded from evidence in the criminal proceeding." [22] We later explained that

> "The *Harling* case bars the Government from using against an accused in a criminal trial a confession or admission *officially obtained from him when he was a juvenile detained under the auspices of the Juvenile Court,* where the latter court has subsequently waived its jurisdiction and transferred the accused for trial to the District Court." [23] (Emphasis supplied.)

The "special practices" applicable to a juvenile underlay the *Harling* ruling, we observed, and evidence "directly or indirectly obtained through juvenile procedures" [24] became subject to exclusion, depending upon whether the procurement of that evidence was "sufficiently divorced from the juvenile procedures * * *." [25]

None of the considerations so outlined can here be discerned.[26] Harrison's statements were not elicited by virtue of the authority of the Juvenile Court or of any of its functionaries. Unlike Harling, Harrison had not in the language of the Code, been "charged with having violated" any law applicable to the Brown homicide, in the Juvenile Court or in any other court. Thus he was not disabled from talking as was Harling. Appellant's present contention carried to its logical end would have us say that if Harrison had been twenty years and eleven months of age when apprehended, his completely voluntary admissions must be excluded simply because they related to a crime committed when he was only ten days short of his eighteenth birthday. Our *Harling* decision requires no such absurd result, for neither its rationale nor the circumstances there considered can have application here.

Rather, confronted by his confederates in crime, he spontaneously submitted his own version of the affair. He even sought to exculpate himself to the extent possible and to ascribe the homicide to an accidental cause. Only after he had

---

21. 111 U.S.App.D.C. 174, 295 F.2d 161 (*en banc*, 1961).

22. *Id.* at 177, 295 F.2d at 164. The Juvenile Court then was deemed to have original and exclusive jurisdiction of all cases and proceedings concerning a person under 21 years of age "*charged with having violated any law*" (emphasis supplied) prior to having become 18 years of age. D.C.CODE § 11–907 (1961).

23. Edwards v. United States, 117 U.S. App.D.C. 383, 384, 330 F.2d 849, 850 (1964).

24. *Id.* at 385, 330 F.2d at 851.

25. *Ibid.*

26. Here the court was not dealing with a "child." This man had become 18 years of age on March 18, 1960. He had gone through 11 grades in school. He was a completely wary adult who knew exactly what he was doing. He had told the officers following his arrest on March 8, 1960 that the only information he had to give them was his name and address and that he did not have to tell them anything else; "You can go to hell," he said. Even when confronted by Sampson and White he asked the officers "Well, what did they tell you?" Having heard from them personally, he went forward with his own version of the episode.

offered his explanation were the police in position to charge Harrison with the Brown offense. So it was that later on, in the afternoon of March 21, 1960, the homicide complaint was lodged against Harrison. The *Harling* case has no applicability to the issue before us, as the *Edwards* case makes clear, and the trial judge did not err in refusing to exclude Harrison's oral statements at the jail on the morning of March 21, 1960.

### D.

■ A different position must be taken with reference to Harrison's written confession. Some hours after Harrison's early morning statements in the presence of Sampson and White, officers returned to the jail without the co-accused. The police then went back over the substance of Harrison's earlier interview and reduced his statements to writing. His confession so taken should have been excluded.[27] Harrison had not been presented before the Commissioner although he readily could have been on the basis of his earlier admissions.

Moreover, as had been the case with respect to Sampson and White, the Government introduced Harrison's statement to a jail classification officer. That statement likewise was erroneously received.[28]

### IV

Other contentions pressed upon us have been fully considered but we deem them so lacking in substance that further discussion is not required. From what has been said it is clear that the convictions of all three appellants must be

Reversed.

**WILBUR K. MILLER, Senior Circuit Judge (concurring):**

I join in Parts I and II of Judge Danaher's opinion and in his treatment of the *Harling* point urged on behalf of the appellant Harrison. There is room for doubt, I think, whether the confessions to the police at headquarters should have been excluded on *Mallory* grounds; but there is no doubt that under the holding of the second *Killough* case,[1] the appellants' statements to the jail classification officers should not have been received in evidence.

I think it is a travesty on justice to reverse the convictions of these three murderers. Reversal is required, however, by the second *Killough* case which is controlling authority although it is, in my view, grossly wrong. So, I very reluctantly concur in the ultimate result.

**WASHINGTON, Senior Circuit Judge:**

I concur in the result. I would add that in my view Harrison's confessions are barred by our decison in Harling v. United States, 111 U.S.App.D.C. 174, 295 F.2d 161 (en banc, 1961). Harrison was 17 years old when the present offense was committed, and 18 at the time of his interrogation at the jail. He was under the exclusive jurisdiction of the Juvenile Court with respect to that offense. See D.C.CODE § 11–907(1) (b) (1961).[1] Waiver of jurisdiction by the Juvenile Court occurred later. But at the time of the interrogation he was subject to the rule in *Harling,* and his confession was barred by that rule.

---

27. Cf. Killough v. United States, 114 U.S. App.D.C. 305, 315 F.2d 241 (*en banc* 1962).

28. Killough v. United States, *supra* note 15 and corresponding text, and see note 16 *supra.*

1. Killough v. United States, 119 U.S.App. D.C. 10, 336 F.2d 929 (1964), decided by Judges Washington and Wright, with Judge Danaher dissenting.

1. "§ 11–907. Jurisdiction—Original and exclusive.

"1. *Children.*—Except as herein otherwise provided, the [Juvenile] court shall have original and exclusive jurisdiction of all cases and in proceedings:

\* \* \* \* \*

"(b) Concerning any person under 21 years of age charged with having violated any law, or violated any ordinance or regulation of the District of Columbia, prior to having become 18 years of age, subject to appropriate statutes of limitation."

ON REHEARING EN BANC

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge,* and FAHY, WASHINGTON,** DANAHER, BURGER, WRIGHT, McGOWAN, TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge, with whom Chief Judge BAZELON, and FAHY, WRIGHT and McGOWAN, Circuit Judges, join:

█ This court en banc, on its own motion, ordered rehearing limited to the issue of the admissibility of Harrison's oral admissions made March 21, 1960. Those admissions, made a few days after he turned eighteen, related to a criminal offense commited prior to his eighteenth birthday. The Juvenile Court Act expressly gives the Juvenile Court original and exclusive jurisdiction over all cases and proceedings involving persons under twenty-one years of age charged with having violated a law prior to having become eighteen years of age.[1] It was not until a week after his confession that the Juvenile Court exercised its statutory authority to waive jurisdiction over the offense. Under the governing rule laid down by this court, en banc, in Harling v. United States, 111 U.S.App.D.C. 174, 295 F.2d 161 (1961), the admissions made March 21 may not be received in evidence in the criminal proceeding in District Court.

█ The trial court considered this to be a close question, but admitted the confession on the ground that "the Harling case should be confined to its strict facts."[2] This was error. *Harling* establishes the broad principle that statements elicited from a minor in police custody at a time when he is subject to the original and exclusive jurisdiction of the Juvenile Court are not admissible against him in the event of a subsequent waiver of that jurisdiction and criminal trial in the District Court. *Harling* puts to one side, as do we, the case of spontaneous statements. What are involved here are statements secured by police questioning and confrontation.

The foundation stone of *Harling* is the opinion of Judge Prettyman in Pee v. United States, 107 U.S.App.D.C. 47, 274 F.2d 556 (1959), which stressed the non-

---

* Sitting by authority of 28 U.S.C. § 46, as amended Nov. 13, 1963.

** Circuit Judge Washington became Senior Circuit Judge on November 10, 1965.

1. For the pertinent provisions in effect in 1960, see Title 11, D.C.Code (1961):
§ 11–907. *Jurisdiction—Original and exclusive.*
1. *Children.*—Except as herein otherwise provided, the court shall have original and exclusive jurisdiction of all cases and in proceedings:
 * * * * *
(b) Concerning any person under 21 years of age charged with having violated any law, or violated any ordinance or regulation of the District of Columbia, prior to having become 18 years of age * * *.
§ 11–914. *Waiver of jurisdiction in case of felony—Transfer of case.*
If a child sixteen years of age or older is charged with an offense which would amount to a felony in the case of an adult, or any child charged with an offense which if committed by an adult is punishable by death or life imprisonment, the judge may, after full

investigation, waive jurisdiction and order such child held for trial under the regular procedure of the court which would have jurisdiction of such offense if committed by an adult; or such other court may exercise the powers conferred upon the juvenile court in this subchapter in conducting and disposing of such cases.

Following Public Law 88–241, Dec. 23, 1963, these provisions were transferred to §§ 1551 and 1553 of Title 11, D.C. Code. The changes made are not material to any point under discussion.

2. The trial court also noted that admission of the confession gave defendant a right of review, while excluding the confession would leave the government without recourse for miscarriage of justice. It would be indefensible to transmute the defendant's right of appeal into an extra burden on close questions arising during trial. However, in this case the trial court made it clear that it was his opinion that the *Harling* objection, while a close question, and worthy of consideration, should be overruled.

criminal philosophy of the Juvenile Court Act.[3] Unfolding the consequences we pointed out in *Harling:* [4]

> *Pee* makes plain that from the moment a child commits an offense, "in effect he is exempt from the criminal law" unless and until the Juvenile Court waives its jurisdiction. During that period the juvenile rules govern; they allow detention for five days without a judicial hearing. * * *

> It is, of course, because children are, generally speaking, exempt from criminal penalties that safeguards of the criminal law, such as Rule 5 and the exclusionary *Mallory* rule, have no general application in juvenile proceedings. * * *

> * * * These strict safeguards [i. e. "procedural safeguards observed in criminal proceedings"], however, are wholly inappropriate for the flexible and informal procedures of the Juvenile Court which are essential to its *parens patriae* function. To avoid impairment of this function, the juvenile proceeding must be insulated from the adult proceeding. This requires that admissions by a juvenile in connection with the non-criminal proceeding be excluded from evidence in the criminal proceeding.

The *Harling* opinion makes clear that the exclusion of admissions "in connection with the non-criminal proceeding" applies not only to statements made to Juvenile Court judges or attachés, but to all statements made at a time when he is subject to the exclusive jurisdiction of the Juvenile Court. The fact that Harling made his statement in the police station was not a reason for limiting the exclusionary rule. On the contrary, we expressly noted that "the problem is accentuated in cases, such as this one, where the admissions are extra-judicial, entirely unenvironed by any court protections." And we specifically rejected a solution which would make admissibility vary from case to case depending on a probing in each case of the capacity of the minor to understand and waive his rights.

Only a minority of jurisdictions use a jurisdictional line below the eighteen year level of our Juvenile Court Act.[5] Proposals to reduce the age limit in the District law have not been approved.[6] The question presented by the teenager accused of serious crime is undoubtedly baffling, and there are no clear answers. Particularly vexing are the problems presented by the sixteen or seventeen year

---

3. See 107 U.S.App.D.C. at 49, 274 F.2d at 558:

> In the event a child commits an offense against the law, the state assumes a position as *parens patriae* and cares for the child. Such a one is not accused of a crime, not tried for a crime, not convicted of a crime, not deemed to be a criminal, not punished as a criminal, and no public record is made of his alleged offense. In effect he is exempt from the criminal law.

4. 111 U.S.App.D.C. at 176–177, 295 F.2d at 163–164.

5. See Hearings on H.R. 6747 before Subcommittee No. 3 of the Committee on the District of Columbia, House of Representatives, 87th Cong., 1st Sess. 63 (1961).

> Congress also used the eighteen year jurisdictional line in the Federal Juvenile Delinquency Act passed in 1938 (see 18 U.S.C. § 5031). That other legislatures were of like mind see e.g. Pa.Laws 1939,

Acts Nos. 226, 227 (increasing age limit from sixteen to eighteen).

6. The Judicial Conference of the District of Columbia Circuit unanimously resolved on November 24, 1959, "that the age limits stated in the Juvenile Court Act should not be lowered." See pp. 1235–36 of Hearings on Juvenile Delinquency, before the Subcommittee to Investigate Juvenile Delinquency of the Senate Judiciary Committee, 86th Cong., 1st Sess. (1960).

> H.R. 6747, 87th Cong., 1st Sess., proposed lowering the maximum age for juveniles from eighteen to sixteen years. The bill was favorably reported by the Committee on the District of Columbia (H.R.Rep.No.1041). However, although the bill passed in the House, S. 486, containing no provision for lowering the age limits, was passed in lieu thereof by the Senate, agreed to by the House, and approved by the President on March 9, 1962. 108 Cong.Rec. 2945, 3874 (1962).

sibility for the waiver determination was deliberately assigned to the judge of the Juvenile Court and not to the prosecutorial arm of the government.[8] The "full

old adolescents precocious in criminal propensity. The problem of which of them should be waived[7] is of such breadth and complexity that the respon-

7. Compare Commentary by the Committee on the Standard Juvenile Court Act of the National Probation and Parole Association relating to § 13 (Transfers) of the Standard Juvenile Court Act, 5 N.P.P.A.J. 353 (October 1959):

It is true that some sixteen- and seventeen-year-olds, and even some younger, have strongly developed tendencies which render them impervious to the average juvenile or family court's services. Accordingly, it is necessary to authorize transfer to the criminal court. Of course, before such transfer is made the court should have sufficient knowledge of the situation so that discretion can be exercised on the basis of an understanding of the child and his situation.

8. See e.g. testimony in the 1960 Senate hearings (cited *supra* note 6) by Judge E. Barrett Prettyman who noted that his interest in the Juvenile Court was of long standing: as Corporation Counsel twenty-five years previous he had the supervisory function for presentation of cases to Juvenile Court and he participated in the drafting of the 1938 statute now on the books. It was at his suggestion as Chief Judge of the Court of Appeals that the Judicial Conference of the District of Columbia Circuit appointed a committee, headed by A. Murray Preston, to study the Juvenile Court in a co-operative venture with the Law Enforcement Council of the District of Columbia (Hearings p. 1216).

Asked to comment on the proposal that the authority to waive or retain Juvenile Court jurisdiction be lodged in the United States Attorney, Judge Prettyman stated: "With the greatest deference, but with the maximum vigor with which I am capable, I disagree with it." (Hearings p. 1220). He amplified:

The statistics of our juvenile court indicate that about one-third of juveniles of ages 16 and 17 years who are charged with committing serious violations of law belong in the first class, that is, what might be called hoodlums; about two-thirds are not to be so classified but are children as to whom chastisement of more or less severity will put an end to their difficulties. The great problem, therefore, is to separate the hoodlums from the others. * * * The great outcries to the effect that juveniles of 16 or 17 years of age, who

repeatedly commit serious offenses, particularly of the vicious type, ought to be tried publicly and committed to penal institutions, while attractive as headlines, find no dissent so far as I am aware.

How should this separation be made? Obviously, it seems to me, it should be made by the juvenile authorities; that is, by the staff and the judge of the juvenile court. These are the authorities to whom the charge of violation is first presented; these are the ones who are equipped to evaluate juveniles. They are the ones who have the records which indicate whether a given juvenile is a "repeater" or not. Proposals that this evaluation be made by the U.S. attorney or by the district court are wholly unrealistic, to my way of thinking.

In his testimony Mr. Preston submitted the resolution of the Judicial Conference of the District of Columbia Circuit dated November 24, 1959, referred to above, note 6, which urged that the Juvenile Court be strengthened by the appointment of additional judges, elimination of jury trials (a provision unique in the District of Columbia law), and expansion of facilities for treatment of youthful offenders.

Likewise asked for comment, Mr. Preston also opposed the proposal to transfer waiver authority to the district attorney. He agreed with Chairman Hennings that the prosecutor would be disposed to make his determination on the basis of the offense rather than the individual. (Hearings p. 1237). He stated:

We believe this decision is by its very nature a judicial one. We do not believe the prosecutor should make it. We do not believe a social worker should make it. We do not think it should be frozen hard into statutory language. The district court does not have the personnel or the organization to make it. It must be made. * * * Now, as the process of waiver is followed now, the opinion of the representative of the prosecutor's office is available to the juvenile court judge when the question is decided by him as to whether waiver should be made or not, and I think that is exactly the way it should be done. * * * It is partly a question of prosecutive merit, partly a social problem, partly

investigation" by the judge, specified in the statute, is not confined to an awareness of the offense at hand, but includes evaluation of the juvenile and his record, made by the judge with the benefit of the contribution of assistants with special background in the social sciences. The "essence of the juvenile court system is * * * the skill and experience of the specialist judge brought to bear upon young people in trouble." [9]

The purpose of the *Harling* doctrine sinks out of sight if the rule is examined only through the instances where it is applied—for those by definition are the exceptional cases, where the Juvenile Court has waived its jurisdiction. *Harling* is a prophylactic rule, to assure Juvenile Court treatment for the cases where

it may yield beneficial results to society. The juvenile courts do not fight delinquents, but delinquency. The sorting out of the waiver cases on the younger side of the general line of jurisdiction is the task assigned to the broad gauge of the judge and not to the prosecutor or the police force. The Juvenile Court's broad exclusive original jurisdiction reflects the experience that a delinquent's capacity for rehabilitation can not be conclusively determined by the seriousness of his offense.[10]

■■ The prosecution in effect invites us to consider the particular circumstances of Harrison's confession and to carve an exception to *Harling* that will embrace these circumstances.[11] This suggestion reflects an attitude that

a question of how old he is, partly a question of what is his record in the past, what is the crime involved. The criteria for that waiver have been very carefully worked out.

\* \* \* \* \*

We think that the juvenile court judge is the only person and the logical person to make this decision.

The waiver criteria of the Juvenile Court were made public by its Policy Memorandum No. 7, November 30, 1959. See 1960 Hearings, *supra* note 6, at pp. 1175–76.

The location of responsibility in the Juvenile Court under the District of Columbia Act is underscored by the fact that in the Federal Juvenile Delinquency Act (*supra* note 5) passed in 1938, Congress placed the separation responsibility in the Attorney General. 18 U.S.C. § 5032. In that situation, of course, there are no federal juvenile courts available with specialized staff and machinery for an immediate investigation of the background of the offender.

9. Kent v. United States, 119 U.S.App.D.C. 378, 343 F.2d 247 (1964), cert. granted, 381 U.S. 902, 85 S.Ct. 1450, 14 L.Ed. 2d 284 (1965).

To be eligible for appointment as a judge of the Juvenile Court a person must have "a broad knowledge of social problems and procedure and an understanding of child psychology." 11 D.C. Code § 1502 (1964 Supp.). The word "broad" was inserted by the 1963 amendment.

10. This is the experience gleaned from cases of thousands of delinquents, accord-

ing to Judge Paul W. Alexander of Toledo, Ohio, a noted authority, as set forth in his article "A Brief Reintroduction to the Juvenile Court," 50 A.B. A.J. 353, 354 (1964).

11. Defense counsel likewise urges us to consider the particular facts of Harrison's confession, urging, as an alternative argument, that those facts call for an application of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). He argues that the absence of counsel at the time of the statement renders it inadmissible, and that it was only the absence of counsel alert to the consequences of the felony murder rule which enabled the police officer to extract a confession by reassuring Harrison that the police appreciated that the killing was only an accident. Escobedo likewise denied all knowledge of the crime until confronted by an accomplice, and likewise sought to exculpate himself through a fact which would be considered meaningful by a layman, but lacked sufficiency as a legal defense.

Harrison did not request counsel. There are varying views as to whether an adult offender must request counsel in order to invoke *Escobedo*. Compare People v. Dorado, 62 Cal.2d 338, 42 Cal. Rptr. 169, 398 P.2d 361 (1964), cert. denied, California v. Dorado, 381 U.S. 937, 85 S.Ct. 1765, 14 L.Ed.2d 702 (1965); United States ex rel. Russo v. State of New Jersey, 351 F.2d 429, (3d Cir. 1965); with People v. Gunner, 15 N.Y.2d 226, 205 N.E.2d 852, 257 N.Y. S.2d 924, (1965); Tracy v. Common-

is contrary to the statement and policy of *Harling's* broad exclusion of statements, though voluntary, elicited from a minor still within the exclusive jurisdiction of the Juvenile Court. It may be worthy of mention that the prosecution's presentation to this court bypasses entirely the group police questioning of Harrison at Police Headquarters on March 8, 1960, when he was kept overnight at the Receiving Home.[12] The prosecution would presumably agree that *Harling* would have required exclusion of Harrison's confession if obtained March 8, or 9, due to the exclusive jurisdiction of the Juvenile Court. The *Harling* rule, like the Juvenile Court's jurisdiction and the non-criminal approach which it protects, depends on age at the time of the offense. The Juvenile Court's exclusive jurisdiction of this offense was in no way impaired by the fact that prior to March

21, the date of the admissions, Harrison turned eighteen, became subject to the jurisdiction of the criminal courts as to other offenses, and was committed to jail for traffic violations. The law conceives that society as well as the youths involved will benefit by maintaining the availability of a juvenile delinquency approach, sparing those who lacked maturity of judgment when under eighteen, and may not have fully appreciated the consequences of their acts, from the stigma of criminality for the rest of their lives, and encouraging them, with changed environment and under proper supervision, to become law-abiding citizens.[13]

A root problem sidestepped by the prosecution is the unfairness inherent in any use of the confession in a criminal case despite the inability to provide basic conventional criminal safeguards.[14] The prosecution could not promptly take Har-

wealth, 207 N.E.2d 16 (Mass.Sup.Jud. Ct., 1965).

We do not reach this *Escobedo* question.

12. Officer Short testified that he arrested Harrison on March 8, 1960. He was accompanied by several other police officers. Harrison was taken to Police Headquarters, where he was questioned concerning the death of Brown in a room asigned to Homicide Squad. Harrison insisted that he knew nothing about it. Short stated there were ten officers present, and beginning to list them he concluded, "I guess, the whole squad were there." He first referred to this session as lasting only three or four minutes, but upon further questioning indicated the questioning may have lasted even longer than fifteen minutes. Efforts by defense counsel to probe the length of this questioning were cut off by the trial court.

Officer Schwab testified that on the afternoon of March 8, 1960, he questioned Harrison in the presence of Detective Coppage (not listed by Officer Short) for about four of five minutes at the Robbery Squad of the Detective Bureau at Police Headquarters; that he advised Harrison "of the seriousness of the offense and his rights"; that he "started questioning him as to what he knew about this case"; that Harrison "told me he did not have to talk to me at all and that I could go to hell"; and

that Schwab then "got up and walked away from him."

The sequence of these two questionings is not clear from the record. In any event, Harrison was taken downstairs after the questioning, was put in a big cell from some time, and was then taken to the Receiving Home. He spent the night at the Receiving Home and the following morning, March 9, was taken back to No. 1 Headquarters by the police. The prosecution witnesses stressed his reappearance March 9, because they wanted to establish that his photograph, a Government exhibit, was taken on that date.

13. In view of this policy the Federal Juvenile Delinquency Act has been held applicable to proceedings begun after the eighteenth birthday, even though that statute, unlike ours, does not expressly establish juvenile delinquency jurisdiction in such cases. United States v. Fotto, 103 F.Supp. 430, 431 (S.D.N.Y. 1952); United States v. Webb, 112 F. Supp. 950, 951 (W.D.Okl.1953); United States v. Jones, 141 F.Supp. 641, 643 (E.D.Va.1956).

14. The following trial colloquy is illuminating:

THE COURT: Of course, hindsight is always better than foresight. It might have been better if they had waited until the waiver before they went down and talked to him at the jail.

rison before a magistrate for a preliminary hearing pursuant to Rule 5. It was a week before the Juvenile Court ruled on waiver. The prosecution would in effect consign Harrison to limbo, with his awkward age making him too young for the protection afforded adults, but too old for the protection of the exclusive Juvenile Court jurisdiction.

 We cannot agree that this unjust and anomalous result is compelled by the use of the word "charged" in the Juvenile Court Act, that the Act precludes the application of the *Harling* rule so long as the police elicit the statement from a juvenile under interrogation before the charge is formally filed in court. In *Harling*, as here, the excluded statement was obtained before the defendant was formally charged in court. Just because an alleged offender is a juvenile, and most vulnerable, does not mean that the police become entitled not only to interrogate without any need to observe Rule 5, which generally requires arrested persons to be brought before a committing magistrate without unnecessary delay, but also to testify fully as to the minor's statements in the event of a criminal trial after waiver. The *Harling* opinion makes clear that the non-criminal Juvenile Court Act approach is exclusive "from the moment a child commits an offense." This view is in accordance with the Congressional instruction that the provisions of the Juvenile Court Act establishing this legislative court "shall be liberally construed" to accomplish the rehabilitative purposes of the law.[15]

MR. SMITHSON: Your Honor, I really can't say that, because they knew he was then an adult.

THE COURT: He was what?

MR. SMITHSON: He was over the age of 18.

THE COURT: Let us assume he was an adult. Then he should have been brought before a magistrate, should he not?

MR. SMITHSON: But not for a crime committed while he was a juvenile.

THE COURT: I think this is a very close case.

15. 11 D.C.Code § 903 (1961), now consolidated with § 902 and transferred to 16 D.C.Code § 2316 (1964 Supp.).

There are three independent and complete answers to any suggestion that there are "jurisdictional" barriers to this liberal construction directed by Congress:

(1) The Juvenile Court, like other District of Columbia legislative courts, rests on the authority of Congress under Article I (sec. 8, cl. 17) of the Constitution, and is not controlled by the "case or controversy" concept applicable to Article III courts. Keller v. Potomac Elec. Co., 261 U.S. 428, 442–443, 43 S.Ct. 445, 67 L.Ed. 731 (1923); O'Donoghue v. United States, 289 U.S. 516, 546, 53 S. Ct. 740, 77 L.Ed. 1356 (1933).

(2) If necessary there would be no difficulty in delineating an "anticipatory jurisdiction" in the Juvenile Court overseeing treatment of the juvenile between arrest and formal charge. Compare Ex parte United States, 287 U.S. 241, 53 S.Ct. 129, 77 L.Ed. 283 (1932), where the Supreme Court, exercising its authority to issue writs in aid of jurisdiction, 28 U.S.C. § 1651, mandamused a district judge in order to protect an eventual jurisdiction it might never exercise. Though there is no criminal "case or controversy" until a crime is formally charged, even a constitutional district court has an anticipatory equity jurisdiction in advance of indictment to "reach forward" to control or prevent improper preparation of evidence by United States Attorneys, or law enforcement officers, through unconstitutional searches and seizures. See Smith v. Katzenbach, 122 U.S.App.D.C. ——, 351 F.2d 810, decided September 3, 1965, slip opinion pp. 8–11, and cases discussed therein. See also Rule 41(e), Federal Rules of Criminal Procedure.

(3) It suffices here to say that a court is discharging an important judicial function when it excludes statements that are offered in court notwithstanding failure of police to observe the limitations applicable to the taking of such statements prior to the time the court's jurisdiction formally attached. A person is fairly said to be "within" or "under" a court's jurisdictional protection though technically the court's jurisdiction attaches only when a charge is filed in court, and prior thereto he is only "subject to" the invocation of that jurisdiction. Compare Judge Holtzoff in United States v. White, 153 F.Supp. 809, 811 (D.D.C.1957), that a juvenile arrested for an offense is "then under the

The prosecution argued that the *Harling* rule unduly discourages Juvenile Court waivers. We asked for available judicial statistics which, though not part of the record on appeal, are properly before us in view of our superintendent power over the administration of justice in the local courts.[16] The data indicate that the Juvenile Court properly does not regard the prosecution's reference to a *Harling* problem as barring waiver.[17]

In any event, *Harling* rests on fundamental considerations of fairness and protection of the Juvenile Court approach. It prohibits the admission against Harrison in a new trial of his statement of March 21, 1960.

WASHINGTON, Senior Circuit Judge:

I concur in the result for the reasons given in my separate concurring opinion in the decision of the original division in this case.

DANAHER, Circuit Judge, with whom WILBUR K. MILLER, Senior Circuit Judge, and BURGER and TAMM, Circuit Judges, join (dissenting):

In Part III, C, *supra* of the opinion of a majority of the original sitting division,[1] the facts appear in some detail and

jurisdiction of the Juvenile Court" and hence Rule 5 is inapplicable.

For a person questioned for acts that would bring him within the original criminal jurisdiction of the district court the limitation on questioning includes the requirement of prompt arraignment, and failure to observe that limitation requires exclusion of the statement. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

For a person questioned for acts that would bring him within the exclusive original jurisdiction of the Juvenile Court, the matter is non-criminal, in the absence of a waiver, and hence is not governed by the rules and limitations established for criminal cases. The implied limitation on such questioning is that statements are deemed taken for use solely before the Juvenile Court.

16. See Fisher v. United States, 328 U.S. 463, 476, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946); Griffin v. United States, 336 U.S. 704, 712–718, 69 S.Ct. 814, 93 L. Ed. 993 (1949); compare Jones v. United States, 105 U.S.App.D.C. 326, 328, 266 F.2d 924, 926 (1959).

17. The Government's data show that between October 1962, and June 1965, the United States Attorney recommended against waiver as to 123 offenders because of the *Harling* exclusionary rule (sometimes accompanied by other problems) and that in 24 instances the Juvenile Court waived the case notwithstanding.

In these 24 cases, there were 4 instances where presentment to the grand jury was declined, 5 cases were ignored by the grand jury, and there were 3 directed verdicts of acquittal and 12 convictions.

Apparently no effort was made to follow the possibility referred to in *Har-ling*—that the district court retain the waived case but exercise the powers conferred on the Juvenile Court, as expressly permitted by D.C.Code § 11–914. For an instance where the district court did elect to sit as a juvenile court, see the order of Judge Youngdahl reported in United States v. Anonymous, 176 F. Supp. 325 (D.D.C.1959). District courts generally have jurisdiction of juvenile delinquency proceedings under the Federal Juvenile Delinquency Act. 18 U.S. C. § 5031 et seq.

The impact of *Harling* is a qualitative matter, and little illumination is provided either by the data filed with us or by the published statistical reports of the Juvenile Court. We have examined the latter and note that there are no data relating waivers to referrals for particular offenses. Total figures for the period October 1962–June 1965, show some 235 cases waived out of approximately 2600 referrals subject to waiver determination. These figures are rounded; the number of referrals should be increased if any significant number of the 240 complaints for "damage to property" and "possession of weapons" are ascribable to felony charges. The data include over 900 referrals for unauthorized use; the Juvenile Court's report for 1964 (p. ii) says these overstate the number of offenses since the report lists five referrals for unauthorized use if five boys are found joyriding in a car earlier stolen by one of them.

1. The three judges who first heard this case decided to reverse the convictions of Harrison and his co-defendants White and Sampson on grounds set forth in the division's opinion, *supra* p. 216. On the point at issue here, Senior Circuit Judge Miller and Circuit Judge Danaher joined in affirming the ruling of the trial judge.

will here be mentioned only briefly. The exact chronology is important, however, particularly as it illustrates how in my view the *en banc* majority opinion has inverted the applicable statute[2] and has failed to recognize the narrow holdings of the *Pee*[3] case and the *Harling*[4] opinion.

The result is that my colleagues of the majority will not allow the Government to offer in evidence at a new trial Harrison's own voluntary oral statements that he planned with others to rob "Cider" Brown, arranged for a get-away car, brought along a sawed-off shotgun for use in executing the felony, and then all but literally blew the head off his victim.

My colleagues so decide on the ground that at the time of the murder, the "child" Harrison was only 17 years 11 months and 20 days old. Therefore, they say, he was disabled after he became 18 years of age from voluntarily outlining the several inculpatory steps even though he had not yet been charged with the murder offense and hence was not before the Juvenile Court or any other court on that account.

### I. *The Facts Here Pertinent.*

Brown was murdered on March 8, 1960.

Harrison became 18 years of age on March 18, 1960.

Harrison on March 18, 1960 was arrested and charged with speeding.

Harrison on March 19, 1960 was sentenced to jail on the traffic charges.

Harrison on March 19, 1960 was charged in the Court of General Sessions by one Edith Penn with breaking and entering her apartment and with larceny.

Harrison waived hearing and was committed to jail to await grand jury action.

Harrison as of March 19, 1960 had not been charged in the Juvenile Court with any of the foregoing offenses.

In the early morning hours of March 21, 1960, White and Sampson signed confessions of their complicity in the "Cider" Brown felony. They implicated Harrison.

About 7:30 A.M. on March 21, 1960, White and Sampson at the jail were brought into confrontation with Harrison. They told Harrison in detail just what they had said to the officer.

Harrison thereupon, on March 21, 1960, during that confrontation, uttered the statements now said by the majority to be inadmissible. Only thus and on that day did the police secure the evidence upon which they later "charged"[5] Harrison.

Harrison on the afternoon of March 21, 1960, for the first time was charged in the Juvenile Court, the police complaint having been based upon what he said had been his part in the slaying of Brown.[6]

### II. *The Majority Holding.*

My colleagues state their holding thus:

"Under the governing rule laid down by this court, en banc, in Harling v. United States, 111 U.S.App.D.C. 174, 295 F.2d 161 (1961), the admissions made March 21 may not be received in evidence in the criminal proceeding in District Court."

The *Harling* opinion which I joined will be mentioned in Part IV hereof, but I note now that it is completely distinguishable. Harling, age 17, had been arrested and *had been charged* with rob-

---

Circuit Judge Washington dissented on this score.

**2.** D.C.CODE § 11–907 (1961), hereinafter referred to in Part III, *infra.* The pertinent Code sections appear in footnote 1 of the *en banc* majority opinion.

**3.** Pee v. United States, 107 U.S.App.D.C. 47, 274 F.2d 556 (1959).

**4.** Harling v. United States, 111 U.S.App. D.C. 174, 295 F.2d 161 (1961).

**5.** The officers later that morning but by noontime secured from Harrison a written confession which in our earlier opinion had been ruled inadmissible, and it is not here involved.

**6.** The fact that the Juvenile Court on March 28, 1960 waived its jurisdiction is irrelevant to our issue.

bing and stabbing his victim. In that case we carefully defined our issue thus:

> "The principal question concerns the admissibility of testimony by Government witnesses of damaging oral statements made by appellant while in police custody *when he was seventeen years old* and before the Juvenile Court had waived its 'original and exclusive jurisdiction.' D.C. Code, § 11–907." [7] (Emphasis added.)

Let us first test the applicability of the statute by reference to its terms.

### III. *The Statute to be Applied.*

The solicitude of our law for true juveniles who have been charged with crime is well described by Judge Leventhal. But it surely is so that not every youthful person under 21 is a ward of government, and even more certain that the Juvenile Court has no jurisdiction whatever over any such person unless there be presented to that court "cases" or "proceedings." The statute does not give that court jurisdiction over offenses, but over *persons charged* in some case.

The statute gives that court original and exclusive jurisdiction "of all cases and in proceedings" concerning "any person under 21 years of age *charged with having violated* any law * * * prior to having become 18 years of age * * *." (Emphasis added.) D.C.CODE § 11–907 (1961).

It is fundamental to our law that, absent a case or controversy, the Judicial branch has no jurisdiction.[8] That is also

the plain concept of the Juvenile Court Act. Only when a person under 21 has been charged with an offense committed prior to his becoming 18 can the Juvenile Court acquire "original and exclusive jurisdiction" of such "cases" or "proceedings." [9] And so, "in the case of a child sixteen years of age or older *charged* with a felony, the Juvenile Court may either proceed with the case itself or waive its jurisdiction." [10] (Emphasis added.)

Yet the holding of our majority colleagues would bar Harrison's post age 18 statements even though he had not yet been charged in any court with the March 8 homicide. Carried to its ultimate conclusion, the court's ruling would exclude Harrison's admissions even if he had not been apprehended until he was twenty one. Surely the Congress never contemplated any such absurd result when it provided exceptional treatment for juvenile offenders, charged in the Juvenile Court.

I wish to dissociate myself from any such reading and application of a statute intended simply to define the jurisdiction of the Juvenile Court. Rather it seems clear to me that Juvenile Court jurisdiction over Harrison adhered *only* when on the afternoon of March 21, Harrison for the first time was charged in the Juvenile Court with Brown's murder.[11]

### IV. *The Holdings in the Harling* [12] *and Pee* [13] *Cases.*

In the *Harling* case the accused, aged 17, had been arrested on the evening of February 21, 1960. Thereupon, having been identified by a clerk at a lineup as

---

**7.** 111 U.S.App.D.C. at 174, 295 F.2d at 161.

**8.** Muskrat v. United States, 219 U.S. 346, 356, 31 S.Ct. 250, 55 L.Ed. 246 (1911); United States v. Choate, 276 F.2d 724, 728 (5 Cir. 1960). An accused, even a juvenile, must be properly before the court. Ex parte Bain, 121 U.S. 1, 13, 7 S. Ct. 781, 30 L.Ed. 849 (1887). So here, unless the Juvenile Court's jurisdiction shall have been invoked pursuant to the Act, there can be no proceeding. See Pee v. United States, *supra* note 3, 107 U.S.App.D.C. at 50, 274 F.2d at 559.

**9.** And similarly if one sixteen years of age or older "*is charged* with an offense" which would be a felony if committed by an adult, the Juvenile Court may, in prescribed circumstances, waive its "jurisdiction." D.C.CODE § 11–914 (1961).

**10.** Pee v. United States, *supra* note 3, 107 U.S.App.D.C. at 50, 274 F.2d at 559.

**11.** And see note 6, *supra*.

**12.** *Supra* note 4.

**13.** *Supra* note 3.

one of two persons who had robbed a store and had stabbed the clerk, the accused was placed in the Receiving Home overnight, questioned at the Robbery Squad the next morning, and later that afternoon, was further identified, this time by the store owner. The latter at the trial testified that when she identified Harling, he admitted in the presence of officers that he had taken part in the robbery but denied that he had stabbed the store clerk. Defense counsel objected on *Mallory* grounds to a detective's testimony concerning Harling's earlier statements to the same effect. The trial judge overruled the objection on the ground that Rule 5 and the *Mallory* doctrine did not apply to juveniles.

We pointed out that the Federal Rules of Criminal Procedure do not apply in juvenile proceedings which are purposely flexible, informal and essential if the Juvenile Court is to administer its *parens patriae* function.

> "To avoid impairment of this function, the juvenile proceeding must be insulated from the adult proceeding. *This requires that admissions by a juvenile in connection with the non-criminal proceeding be excluded from evidence in the criminal proceeding.* We hold this requirement applicable in this case and in all similar cases in the future." [14] (Emphasis added.)

Obviously the instant case is not even remotely "similar."

The holding of the *Harling* case stemmed directly from the procedures created by our Juvenile Court Act to serve the best interests of a "child" who had been charged with the commission of crime before reaching the age of eighteen. Once charged, and once within the jurisdiction of the Juvenile Court, the juvenile would be subject to its procedures, depending upon whether the Juvenile Court retained that jurisdiction or waived the accused over to the District Court.

Harrison was not so charged, nor had he been *held under the auspices of the Juvenile Court.* He was already in jail pursuant to *adult* charges when confronted by his confederates. He was free to talk, and he did so. I submit that the only way the majority can assert that *Harling* bars such voluntary statements is by their now saying what *Harling* does not say. *Harling* actually says that if admissions *"obtained in juvenile proceedings"* before *"waiver of jurisdiction"* may be introduced in an adult proceeding after waiver, *"the juvenile proceedings"* are made to serve as an adjunct to and part of the adult criminal process. (Emphasis added.) 111 U.S.App.D.C. at 177, 295 F.2d at 164.

Even the reasoning of *Harling* belies the majority's present interpretation, as will be seen from the explanation in Edwards v. United States.[15]

In that case this court said:

> "The *Harling* case bars the Government from using against an accused in a criminal trial a confession or admission officially obtained from him *when he was a juvenile detained under the auspices of the Juvenile Court,* where the latter court has subsequently waived its jurisdiction and transferred the accused for trial to the District Court. Our ruling in *Harling* resulted from the special practices which follow the apprehension of a juvenile. He may be held in custody by the juvenile authorities—*and is available to investigating officers*—for five days before any formal action need be taken. There is no duty to take him before

---

14. 111 U.S.App.D.C. at 177, 295 F.2d at 164. Thus a majority of this court joined in the *Harling* ruling.

 Moreover we *expressly* refrained from an intimation of views as to whether we would deem admissible, in an adult criminal trial, spontaneous statements by a

juvenile if those statements had not been made in the course of the permissible interrogation authorized by the Juvenile Court Act. *Ibid.* That question was not then before us.

15. 117 U.S.App.D.C. 383, 330 F.2d 849 (1964).

a magistrate, and no responsibility to inform him of his rights. * * * *Harling* is a simple recognition that it would be unfair to the individual juvenile and a mockery of the juvenile system to allow unrestricted use of evidence, *gathered through such procedures,* in the adult court." [16] (Emphasis added.)

My colleagues say that the *Harling* opinion finds its foundation in Pee v. United States, supra. As pertinent here, that case involved three appellants seventeen years of age or younger who had been charged in the Juvenile Court with serious felonies. Held for two weeks under jurisdiction of the Juvenile Court before the cases were waived to the District Court, the accused had made statements to the police. As the *Edwards* case, *supra,* demonstrates, under Juvenile Court procedures but for Juvenile Court purposes *only,* a person there charged is actually made "available to investigating officers."

So it was that this court held that such statements, so elicited, which could have been received in juvenile proceedings, were erroneously admitted against the appellants in the District Court trial after waiver. Judge Prettyman explained:

"Thus, in the case of a child sixteen years of age or older *charged with a felony,* the Juvenile Court may either proceed with the case itself or waive its jurisdiction." [17] (Emphasis added.)

16. *Id.* at 384–385, 330 F.2d at 850–851.

17. Pee v. United States, *supra* note 3, 107 U.S.App.D.C. at 50, 274 F.2d at 559. And see the text of D.C.CODE § 11–914 (1961) as set forth in note 1 of the majority opinion.

18. The *en banc* majority observes in its note 11 that it does not "reach this *Escobedo* question." Of course it does not, for logically there can be no *Escobedo* problem if the majority is otherwise correct in its contention that Harrison's jail statement is to be barred because of his juvenile status.

The *Pee* case does not hold that a juvenile can not commit a crime. It does not hold that a person more than 18 years old can not effectively admit that he did commit a crime before he was 18. No such result can be attributed either to our cases or to the statute.

On the contrary, the statute contemplates as *Pee* makes evident, that a "child" is exempt from criminal processes and the results of a criminal trial *only* when he has been proceeded against as a juvenile. So it is that once *charged* with a felony, a person over 16 may be proceeded against in the Juvenile Court; that court may waive its jurisdiction over the person so that a case may go forward in the District Court; and the latter may determine either to exercise Juvenile Court powers exactly as would the Juvenile Court, or apply the usual federal criminal procedure. And if the latter course be decided upon, statements elicited from the juvenile while detained after he had been charged under the auspices of the Juvenile Court, may not be used against him at the criminal trial in the District Court.

That is all that the *Pee* case was talking about. It is all that *Harling* said. That is what *Edwards* explains. I decline to find in those cases or in the statute any basis whatever for what the majority now holds.[18]

I am unable to agree that a jurisdictional statute is to be so construed as to disable one over 18 not previously charged, from voluntarily stating that

In any event the *Escobedo* holding by its own terms is definitely limited and could have no applicability here. See Cephus v. United States, 122 U.S.App. D.C. 187, 352 F.2d 663, 666 (1965), concurring opinion, rehearing *en banc* denied, October 5, 1965.

Again, in Jackson v. United States, 119 U.S.App.D.C. 100, 104, 337 F.2d 136, 140 (1964), we commented specifically that "If there were a rule that a confession may not be received *if made by an accused without counsel,* that would be the end of this case—and of scores like it." Certiorari was denied, 380 U.S. 935, 85 S.Ct. 944, 13 L.Ed.2d 822 (1965).

he was a murdering robber before he was eighteen. I think such evidence under the circumstances herein reviewed should be deemed competent.

So, I respectfully dissent.